```
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
 2                       HAMMOND DIVISION

 3

 4

 5   UNITED STATES OF AMERICA,

 6       vs.                          2:12-CR-165

 7   KEVIN PAUL BREWSTER,

 8       Defendant.

 9

10

11                     TRANSCRIPT OF SENTENCING

12            BEFORE THE HONORABLE JOSEPH VAN BOKKELEN

13                  UNITED STATES DISTRICT JUDGE

14                      HAMMOND, INDIANA

15                      JANUARY 30, 2014

16

17

18

19   Court Reporter:          Richard D. Ehrlich, RMR, CRR
                              Official Court Reporter
20                            United States District Court
                              5400 Federal Plaza, Suite 4082
21                            Hammond, IN 46320
                              (219) 852-6557
22

23

24   Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.
```

1                     A P P E A R A N C E S

2

3    FOR THE GOVERNMENT:

4              Jill Koster
               U.S. Attorney's Office
5              5400 Federal Plaza, Suite 1500
               Hammond, IN 46320
6              (219) 937-5500

7

8    FOR THE DEFENDANT:

9              Matthew Soliday
               Federal Community Defenders, Inc.
10             31 Sibley Street
               Hammond, IN 46320
11             (219) 937-8020

12

13

14   Kevin Paul Brewster, Defendant, present in person.

15

16

17                        I N D E X

18

19   <u>Janice Regnier</u>

20   Direct Exam by Ms. Koster, page 29
     Cross-Exam by Mr. Soliday, page 36

21

22

23

24

25

1          THE COURT:  Good afternoon.

2       This case is before the Court for the sentencing of the

3    defendant, Kevin Paul Brewster, in Case Number 2:12-CR-165.

4       Mr. Brewster is present with his attorney, Matt Soliday,

5    and the Government is represented by Assistant United States

6    Attorney Jill Koster.  Also present at the Government's table

7    is FBI Special Agent Matt Chicantek.  And also present is Paula

8    Pramuk and Janice Lawton of the United States Probation Office.

9       Mr. Brewster, how are you feeling today?

10          THE DEFENDANT:  Okay.

11          THE COURT:  Okay.  Ready to go forward?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Okay.  Do you have any family or friends

14   in the courtroom today?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  Would you introduce them?

17          THE DEFENDANT:  My father and my brother.

18          THE COURT:  Thank you very much for being here to

19   show your support for Mr. Brewster.

20       Ms. Koster, the criminal offenses for which Mr. Brewster

21   was convicted involved victims, as that term is defined.  Has

22   notice been given to those victims?

23          MS. KOSTER:  Yes, Your Honor.

24          THE COURT:  And are they present -- some of -- are

25   they present in the courtroom?

1      MS. KOSTER:  Your Honor, at the moment, there is a

2  victim who is present.  She's not in the courtroom at the

3  moment.

4      THE COURT:  But she's here?

5      MS. KOSTER:  Family members of the victims are

6  present.

7      THE COURT:  Okay.  During this hearing, I may need to

8  ask Mr. Brewster some questions, and Mr. Brewster may also wish

9  to make a statement on his own behalf.  So before we begin, I

10  ask that Mr. Brewster please stand, turn and face my courtroom

11  deputy, raise your right hand so she can place you under oath.

12          KEVIN PAUL BREWSTER, DEFENDANT, SWORN

13      THE COURT:  Okay.  You can be seated.

14  BY THE COURT:

15  Q.   Mr. Brewster, do you understand that you are now under

16  oath, and if you answer any of my questions falsely, or if you

17  make any false statements, your false answers or statements may

18  later be used against you in another prosecution for perjury or

19  making a false statement?  Do you understand that?

20  A.   Yes, sir.

21  Q.   Mr. Brewster has pled guilty to Counts 1 through 6 of the

22  indictment, and the Court has adjudged him guilty on those

23  counts.  In Count 1 through 4, Mr. Brewster was charged

24  pursuant to 18, U.S.C. Section 2251(a) with production of child

25  pornography on four different occasions.

1          In Count 5, Mr. Brewster was charged pursuant to 18,

2    U.S.C. Section 2252(a)(2) with receipt of child pornography.

3          And in Count 6, Mr. Brewster was charged pursuant to 18,

4    U.S.C. Section 2252(a)(4) with possession of child pornography.

5          I received from the probation officer a written

6    presentence investigation report and addendum and sentencing

7    recommendation.  I've studied them in preparation for this

8    hearing.

9          Ms. Koster, did you receive a copy of the presentence

10   report and addendum?

11              MS. KOSTER:  I did, Your Honor.

12              THE COURT:  And, Mr. Soliday, did both you and your

13   client receive a copy of the presentence report and addendum?

14              MR. SOLIDAY:  Yes, Your Honor.

15              THE COURT:  Mr. Brewster, did you review the

16   presentence report and addendum and go over their contents with

17   Mr. Soliday?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  The presentence report and addendum have

20   been placed in the record.  The addendum to the presentence

21   report indicates that the Government and Mr. Brewster each

22   filed an objection to the presentence report.  The Government

23   maintains that Mr. Brewster should lose all credit for

24   acceptance of responsibility because he has falsely denied his

25   relevant conduct regarding the number of times he sexually

1   abused the victim referred to in the indictment, whom the Court

2   will refer to as Jane Doe 1, and another alleged victim, who

3   the Court will refer to as Jane Doe 2.

4       Mr. Brewster maintains the only times he touched Jane Doe

5   1 are the times he recorded on videotape and objects to

6   paragraph nine of the presentence report in which Jane Doe 1

7   estimates that Mr. Brewster's sexual abuse of her occurred

8   three to four times a week.  He also maintains that he has not

9   falsely denied any conduct regarding Jane Doe 2 but instead

10  remains silent because there is a pending state court criminal

11  case against him involving her.

12      And, Counsel, have I accurately identified the issues that

13  are in dispute?

14          MS. KOSTER:  Yes, Your Honor.

15          THE COURT:  Mr. Soliday?

16          MR. SOLIDAY:  Yes, Your Honor.

17          THE COURT:  And would counsel both agree that the

18  factual statements contained in the presentence report that are

19  not identified in the addendum as being in dispute are

20  materially accurate?

21          MS. KOSTER:  Yes, Your Honor.

22          MR. SOLIDAY:  Yes, Your Honor.

23          THE COURT:  The Court adopts those statements not in

24  dispute as its findings of fact.

25      The Court will now give counsel an opportunity to argue or

1    present any evidence in addition to what has been presented in

2    the addendum to resolve the issues that are in dispute.  The

3    Court will then state its findings on objections.

4        Ms. Koster.

5            MS. KOSTER:  Judge, in lieu of having the victims

6    testify regarding the abuse, I would like to play excerpts from

7    interviews they gave previous.

8            THE COURT:  Okay.  What I -- are these going to

9    affect the guideline computations, or is this more 3553(a)

10   material?

11           MS. KOSTER:  Well, it goes to supporting the

12   Government's objection to the defendant's receiving acceptance

13   of responsibility credit.  So in that sense, it is relevant to

14   the guideline calculation.

15           THE COURT:  Okay.  Any objection?

16           MR. SOLIDAY:  No objection, Your Honor.

17           MS. KOSTER:  Judge, the videos in question are

18   subject to a protective order, which is docket entry 16 in the

19   docket.  And because the Government insisted that strict

20   confinements be placed on how the defense uses these disks, we

21   feel we should adhere to those same confinements, and we would

22   ask that all nonessential individuals who are present today be

23   excused from the courtroom while the videos are played.

24           THE COURT:  Any objection?

25           MR. SOLIDAY:  No, Your Honor.

1    THE COURT:  Okay.  The Court will grant that request

2    based on the sensitivity of the matters involved in this case

3    and what I understand the videos will depict.  So anybody

4    that's not part of the Court staff, or otherwise involved in

5    this case in the sense that they're part of my staff with the

6    Government or with defense counsel and probation, are excused

7    and can wait outside.  And when we are done viewing the video,

8    you can be brought back in.

9         Also, Ms. Koster, one other thing.  Who is the other

10   person at your table?

11        MS. KOSTER:  Judge, this is Janice Regnier.  She's a

12   detective.

13        THE COURT:  From the Portage Police Department?

14        MS. KOSTER:  With the Portage Police Department, yes.

15        THE COURT:  Okay.

16        MS. KOSTER:  And she is also a co-case agent on this

17   case with Special Agent Matt Chicantek.

18      (Courtroom closed.)

19        THE COURT:  Right.  And who is still in the

20   courtroom?

21        MS. KOSTER:  So, Judge, present still in the

22   courtroom is the victim's Jane Doe 1 and Jane Doe 2's mother

23   and an attorney who is representing the family through this

24   difficult time.  I would ask that they be allowed to stay.  The

25   victim's mother is the victim's representative.  She does have

1    a legal right to be present during court proceedings, and she

2    wants to stay.  So I would ask that she be allowed to stay.

3              THE COURT:  Mr. Soliday?

4              MR. SOLIDAY:  No objection.

5              THE COURT:  Okay.  She can stay, likewise, as her

6    counsel.

7         Go ahead and play the disk.

8              MS. KOSTER:  Yes, Judge.  Should I call a witness to

9    lay foundation for these disks?  I can do that.  I was planning

10   to have Detective Regnier testify a little bit later relevant

11   to 3553(a), but I could call her very quickly.

12             THE COURT:  Well, or what you can do is just make a

13   statement yourself what they represent, and unless Mr. Soliday

14   has an objection to it, we'll let that stand as the basis for

15   it because I assume you're going to correctly state what is the

16   genesis of these disks?

17             MS. KOSTER:  Yes, Judge.  If Detective Regnier were

18   called to testify, she would lay foundation for Government's 3

19   and 4.  They are videotaped interviews of Jane Doe 1 and Jane

20   Doe 2 in this case, and she would explain how a child's

21   forensic interview is conducted, and she might explain some of

22   the terminology that is used; for example, of particular

23   relevance here, Jane Doe 2 refers to the male penis as a potty.

24   And so you'll notice when she is giving her -- when she's

25   talking to law enforcement about what her father did to her,

1   she refers to his penis as a potty.  And Detective Regnier

2   would've laid that foundation.  I will call her later.

3        And I will later lay foundation for these disks and move

4   to admit them so the record is clean on that.  But for now,

5   what I'd like to play is an excerpt from each of these disks.

6   I'll play from 18 minutes into the disk to 32 minutes in on

7   Government Exhibit 3.  That's about 14 minutes.  And I will

8   play from 36 minutes in to 42 minutes in, which is about six

9   minutes from Government Exhibit 4.

10               THE COURT:  Again, Mr. Soliday, you have no objection

11   to that, correct?

12               MR. SOLIDAY:  Correct, Your Honor.

13               THE COURT:  Go ahead.

14               MS. KOSTER:  Also, just a little further proffer for

15   the Court to put these in context.  Generally, the way child

16   forensic interviews are conducted is they don't start out

17   immediately asking about the abuse.  They try to establish a

18   rapport with the child and make the child feel comfortable and

19   at ease.  The portions I am playing are where these children

20   begin to disclose the sexual abuse so we don't listen to the 15

21   minutes or 36 minutes of putting the children at ease.  I don't

22   want the Court to think that I'm cherry-picking part of their

23   disclosure.

24        Defense counsel has been provided with copies of these,

25   and if he wants to play other portions of the disk, the

 1    Government has no objection.

 2        Do you have this on your screen?

 3            THE COURT:  No.  I don't have anything on.

 4            MS. KOSTER:  While she's doing that, I'm just going

 5    to make sure the sound is okay.

 6            THE COURT:  Is she coming?

 7            THE CLERK:  Yes.

 8            THE COURT:  Just let me know when it's ready to play,

 9    and I'll come back in rather than just sitting here.

10        (Break.)

11            THE COURT:  Ms. Koster, you can proceed.

12            MS. KOSTER:  Thank you, Judge.

13        (Exhibit No. 3, DVD, played.)

14            MS. KOSTER:  Judge, I can keep playing it if you

15    would like me to.  That was the clip I planned to play.

16    Actually, that was a little longer than I planned to play.

17            THE COURT:  Okay.

18            MS. KOSTER:  And I have the forms that, the child

19    diagram and the adult diagram if the Court wants to see it,

20    where she circled the adult penis talking about a private part.

21            THE COURT:  Next one you're playing is number four?

22            MS. KOSTER:  The next one I play is Exhibit 4, and

23    I'm going to start it at 36 minutes.  I plan to play it until

24    about 42 1/2 minutes.

25        For the record, I played Government Exhibit 3 from 18

 1   minutes to 35 minutes and 4 seconds.

 2          (Exhibit No. 4, DVD, played.)

 3              MS. KOSTER:  That, Your Honor, is the gist of her

 4   disclosure, and I played it up until 43 minutes and 32 seconds.

 5              THE COURT:  Okay.  Thank you very much.

 6       Mr. Soliday, do you want anything more played on those two

 7   CDs?

 8              MR. SOLIDAY:  No, Your Honor.

 9              THE COURT:  3 and 4.

10       Okay.  Can the courtroom be reopened at this point once

11   you clear your screen?

12              MS. KOSTER:  Yes, Your Honor, it can be.

13       Actually, Judge, can I just make a brief argument?

14       I'll grab him.

15       I think you'll understand why I want to make this argument

16   outside the presence of the victim in particular, if I may.

17          Part of the reason why it's clear that the defendant

18   sexually abused his daughters other than the times that they

19   were videotaped, first of all, we don't have any videotaped

20   evidence of his sexual abuse of Jane Doe 2, who is the very

21   young child you just heard from.  So she's clearly describing

22   having to do the same thing her sister had to do, although she

23   uses her own words to describe exactly what was done.  In

24   addition, Jane Doe 1 also said that she had to do it many times

25   other than when he was videotaping it.  For example, she

1   described having to ride on top of his naked body while she was

2   naked or partially clothed, and she didn't recall him having

3   videotaped that.  As the Court is aware, I think it's clear in

4   the PSR, the way that the investigation in this case unfolded,

5   law enforcement was only able to obtain homemade child

6   pornography featuring these victims that their mother happened

7   to grab before she ran out of the house to report him to law

8   enforcement.  So basically her kids disclosed to her.  She went

9   to look to see if there was video evidence.  She found some

10  tapes.  She viewed a part of one tape.  She saw one of her

11  daughters engaging in sexual acts with her husband on the

12  videotape, and she immediately then went to alert law

13  enforcement and grabbed a few tapes with her.

14      After that, the defendant was made aware that his wife had

15  gone to the police department to report him, and he was made

16  aware of what she was reporting him for through his

17  communications with his wife, and he was home alone for some

18  period of time, at least an hour or two that he was home alone

19  during that time period.  Not surprisingly, then, when law

20  enforcement later obtained a warrant to search the house, no

21  additional homemade child pornography was found in the house.

22      On the videos that were found -- and this is the part

23  that's sensitive and why I didn't want the victim to be in the

24  courtroom, and the Court has now reviewed those videos -- you

25  can see that the child has been coached to do what she's doing.

1   You can tell that this is not the first time that she has

2   engaged in a sexual act with her father.  You can tell it from

3   the conversation that they had back and forth; for example, the

4   moment where he says, "You're the best daughter in the world,"

5   or, "You're a great daughter."  Something to that effect.

6       And she says, "Why?"

7       And he says, "Because not every daddy can get their

8   daughter to suck their dick."

9       And she says, "What?  I thought every little girl did

10  this."

11      So it's clear they talked about it previous.  It's also

12  clear from her conduct on the video that this is not the first

13  time she's engaged in these acts.

14      So all of that evidence supports the Government's position

15  that the defendant did sexually abuse his daughters more times

16  than he is now claiming to the Court.  He's denying that

17  relevant conduct, and, therefore, he should not receive full

18  credit for acceptance of responsibility.  Recognizing that

19  under the guidelines, it's essentially an academic point

20  because he scores out so high above life; however, something

21  that the Government, you know, feels on principle that the

22  Court should make a finding to that effect since he is denying,

23  clearly, relevant conduct in this case.

24      Thank you.

25          THE COURT:  Thank you.

 1          Mr. Soliday, do you have any response to that at this
 2    point?
 3               MR. SOLIDAY:  Yes, Your Honor.  With regard to Jane
 4    Doe 2, he's just remaining silent on that.  We've had a number
 5    of draft presentence reports.  Just so you're clear, he's not
 6    admitting or denying that because he --
 7               THE COURT:  I understand.
 8               MR. SOLIDAY:  -- he has a pending state case.  And,
 9    actually, the state case is also pending against him for Jane
10    Doe also.
11          With regard to -- the Government's implying that he
12    destroyed evidence basically is what she's saying, that he's
13    destroyed some -- or gotten rid of some other videos of Jane
14    Doe 2.  That's not the case.  There's no evidence of that.
15    Actually, there's evidence to the contrary.  The child
16    pornography that was on the computers, he didn't destroy that.
17    If he was alone and in the house and destroying evidence, he
18    would destroy everything, you know.  So he wouldn't have --
19    there would be no evidence against him, but that's not the
20    case.  So that didn't happen.
21          With regard to Jane Doe and the number of times that the
22    conduct happened, we'll just let you judge the credibility of
23    the video and go from there.
24               THE COURT:  Okay.  Thank you.
25          Anything else before the public is brought back in?

1          MS. KOSTER:  Just a very brief response to that, Your

2     Honor.  I'm not saying he destroyed evidence.  I'm saying he

3     had an opportunity to destroy evidence.  And then after law

4     enforcement obtained a warrant to search his house, we didn't

5     find any more homemade child pornography.  Yes, if the

6     defendant were a computer forensic expert, he would be able to

7     delete the child pornography on his computer in such a way that

8     law enforcement wouldn't be able to find it.  He was unable to

9     accomplish that fete in the time that he had; however, I'm

10    going to guess, if he did have other homemade child pornography

11    in the house showing him sexually abusing his own daughters, he

12    would've started with that, especially if they're physical

13    tapes.  They were cassette tapes from an older type video

14    recorder which are very easy to destroy.  So my guess is he

15    would've started there as opposed to starting on the computer

16    in attempting to delete evidence from there.

17        I can't prove that he did that.  All I'm saying is it

18    would be quite a coincidence if the only child pornography that

19    he had produced, despite Jane Doe telling law enforcement that

20    he did it to her three to four times a week, and that he

21    videotaped it approximately 20 times -- that may not have been

22    on the clip that I played, but she does say that in the

23    interview -- that's quite a coincidence, that the mother just

24    happened to grab the only tapes that existed, and SD cards that

25    existed in the house that showed him sexually abusing his

 1   daughters.  Just like defendant can flush drugs down a toilet,

 2   these small cassette tapes and the recorder would easily have

 3   flushed down a toilet as would SD cards in a digital camera,

 4   which the victim described him using not just an SD card that

 5   he had, but one that his mother had.  I'm sorry.  Strike that.

 6        He didn't use an SD card that his mother had.  He would

 7   take her SD card out of her camera and put his SD card in.  It

 8   would be very easy to flush something like that down the

 9   toilet.  I can't prove that he did it.  I'm just saying it's

10   quite a coincidence.  And the Government's position is,

11   consistent with the victim's testimony, he sexually abused them

12   more times than what we just happened to have evidence of on

13   tape.

14        Thank you.

15             THE COURT:  Thank you.

16        Anything further before the public comes back in?

17             MR. SOLIDAY:  No, Your Honor.

18             MS. KOSTER:  Thank you, Judge, for allowing that

19   presentation.

20             THE COURT:  No problem.

21        Bring the public back in.  Unseal the courtroom.

22        (Courtroom open.)

23             THE COURT:  Have you both made all the arguments you

24   want to make as to those objections?

25             MR. SOLIDAY:  Yes, Your Honor, I have.

1          MS. KOSTER:  Yes, Your Honor.

2          THE COURT:  Okay.  The evidence available to the

3   Court, has to determine whether Mr. Brewster has falsely denied

4   how many times he sexually abused Jane Doe 1, consists of

5   statements she made to law enforcement and to her mother when

6   she was nine years old as well as four videos and

7   Mr. Brewster's claim that the only times he touched her are the

8   times depicted in the videos.

9          The Court has also viewed Government's Exhibits 3 and 4,

10  which is additional information that's been made available to

11  the Court as to the number of times this took place.

12         The victims say that they would be required to perform

13  oral sex on him in exchange for such privileges as going

14  outside or playing a video game, giving credence to her claim

15  that it was a regular occurrence.  Some of the statements

16  Mr. Brewster is heard making in the video also lend support to

17  her claim, statements such as, "You're getting awfully good at

18  that," and, "You're" -- and I'm going to paraphrase here a

19  little bit -- "do it really good."

20         Moreover, Jane Doe 1 expressed concern to her mother about

21  getting anyone in trouble.  This concern for her abuser makes

22  it less likely that she would exaggerate the extent of the

23  abuse.

24         And, again, the Court has reviewed Government's Exhibit 3

25  and 4 which are in addition to what the Court had before.  Some

1    of it was within the context of the presentence report.  The

2    main difference is being able to see the victims themselves as

3    they talked to the Portage police officer.

4        The Court finds Jane Doe 1's claim that the abuse took

5    place several times a week for about two or three years more

6    credible than Mr. Brewster's claim it happened only on the

7    occasions for which a video record was found.

8        I think there was some inveigling that was taking place at

9    times.  The videos that the Court viewed yesterday, with the

10   consent of both counsel, clearly indicated to the Court that

11   these were not the only times that that conduct took place.

12   Whether it's two or three times a week or not it really doesn't

13   make a difference.  It's clearly more than four times that is

14   just on those videos.

15       Because the Court finds that Mr. Brewster has falsely

16   denied the extent of his abuse of Jane Doe 1, he's not entitled

17   to any reduction for acceptance of responsibility in making the

18   guideline calculations; however, the Court notes that even if

19   Mr. Brewster were to receive a two or three-level reduction for

20   acceptance of responsibility, it would not change the guideline

21   calculation because either way his offense level would be

22   higher than 43, which, according to the guidelines, must be

23   reduced to 43.

24       The Court does not find that Mr. Brewster's silence with

25   respect to the alleged abuse of Jane Doe 2 is a false denial of

1  relevant conduct, but this is moot since the Court has already

2  determined that he should not receive credit for acceptance of

3  responsibility.

4      Having resolved the objection to the probation officer's

5  conclusions as to the applicable sentencing guidelines, I will

6  now state how the sentencing guidelines apply in this case.

7  The Court has determined that Mr. Brewster's total offense

8  level is 43.  This calculation is derived as follows:

9  Mr. Brewster's base offense level for Count 1 is 32.  This base

10  offense level is increased by four levels pursuant to Section

11  2G2.1(b)(1)(A) of the sentencing guidelines because the offense

12  involved a minor who had not obtained the age of 12 years.

13      The base offense level is increased by two levels pursuant

14  to Section 2G2.1(b)(2)(A) of the sentencing guidelines because

15  the offense involved the commission of a sexual act or sexual

16  contact.

17      Four levels are added pursuant to Section 2G2.1(b)(4)

18  because the offense involved material that portrays sadistic or

19  masochistic conduct or other depictions of violence.

20      Two levels are added pursuant to Section 2G2.1(b)(5)

21  because the defendant is a parent, relative, or legal guardian

22  of the minor involved in the offense.

23      Two levels are added pursuant to Section 2G2.1(b)(6)(B)

24  because the offense involved the use of a computer to persuade,

25  induce, entice, or coerce the minor to engage in sexually-

 1   explicit conduct.

 2        The adjusted offense level for Count 1 is 46.

 3        The same base level of 32 and the same additions apply to

 4   Counts 2, 3, and 4.  Accordingly, the adjusted offense level

 5   for each of these counts is also 46.

 6        Counts 5 and 6 involving receipt of child pornography and

 7   possession of child pornography are grouped.  The base level

 8   for Count 5 and 6 is 22.

 9        Two levels are added pursuant to 2G2.2(b)(2) because the

10   material involved a minor who had not obtained the age of 12

11   years of age.

12        Four levels are added pursuant to 2G2.2(b)(4) because the

13   offense involved material that portrays sadistic or masochistic

14   conduct or other depictions of violence.

15        Five levels are added pursuant to 2G2.2(b)(5) because the

16   defendant engaged in a pattern of activity involving the sexual

17   abuse or exploitation of a minor.

18        Two levels are added pursuant to 2G2.2(b)(6) because the

19   offense involved the use of a computer, or interactive computer

20   service, service for the possession or receipt of the material,

21   or for assessing with intent to view the material.

22        Five levels are added pursuant to 2G2.2(b)(7)(D) because

23   the offense involved 600 or more images.  This creates a

24   subtotal of 40 for Counts 5 and 6, but 2G2.2 directs that if

25   the offenses involved causing a minor to engage in sexually-

1  explicit conduct for the purpose of producing a visual

2  depiction of such conduct, Section 2G2.1 is to be applied if

3  the resulting offense level is greater than that determined

4  under 2G2.2.  Because Section 2G2.1 results in a higher offense

5  level, that section will be used.

6      The base offense level under Section 2G2.1 is 32.  This

7  base offense level is increased by four levels pursuant to

8  Section 2G2.1(b)(1)(A) of the sentencing guidelines because the

9  offense involved a minor who had not obtained the age of 12.

10      The base offense level is increased by two levels pursuant

11  to Section 2G2.1(b)(2) of the sentencing guidelines because the

12  offense involved the commission of a sexual act or sexual

13  conduct.

14      Four levels are added to Section 2G2.1(b)(4) because the

15  offense involved material that portrays sadistic or masochistic

16  conduct or other depictions of violence.

17      Two levels are added pursuant to Section 2G2.1(b)(5)

18  because the defendant is the parent, relative, or legal

19  guardian of the minor involved in the offense.

20      Two levels are added pursuant to Section 2G2.1(b)(6)(B)

21  because the offense involved the use of a computer to persuade,

22  induce, entice, or coerce the minor to engage in sexually-

23  explicit conduct.  The adjusted offense levels for Counts 5 and

24  6 is 46.

25      Now, the multiple-count adjustment must be applied

1    according to the rules set out in Section 3D1.4 of the

2    guidelines.  Each of Counts 1 through 4 are assigned one unit,

3    and Counts 5 and 6 together are assigned one unit for a total

4    of five units.  This requires the addition of four levels to

5    the offense level applicable to the group with the highest

6    offense level resulting in a combined adjusted defense level of

7    50, which is to be treated as an offense level of 43.

8        Mr. Brewster's criminal history category is one, which

9    combined with Mr. Brewster's total offense level results in a

10   guideline sentencing recommendation of life in prison; however,

11   pursuant to United States Sentencing Guidelines Section

12   5G1.1(a), because the statutorily authorized maximum sentence

13   is less than the minimum of the applicable guideline range, the

14   statutory authorized maximum sentence for each count shall be

15   the guideline sentence, which in this case is 360 months of

16   imprisonment on Counts 1 through 4, 240 months on Count 5, and

17   120 months on Count 6.

18       Furthermore, according to the sentencing guidelines, a

19   term of supervised release is five years to life on all counts.

20   Mr. Brewster is not eligible for probation.  The fine is 25,000

21   to $250,000.  Restitution has not been requested, and a special

22   assessment of $600.

23       These sentencing guidelines calculations do not take into

24   account the factors or arguments for a variance from the

25   advisory sentencing guidelines under 18, U.S.C. § 3553(a).

1          And, Counsel, based on my findings, am I accurate?

2     Ms. Koster?

3               MS. KOSTER:  Yes, Your Honor.

4               MR. SOLIDAY:  Yes, Your Honor.

5               THE COURT:  Okay.

6          And, Mr. Brewster, do you agree with Mr. Soliday?

7               THE DEFENDANT:  Yes, sir.

8               THE COURT:  The sentencing guidelines are just one of

9     the factors that influences this Court in sentencing.  The

10    Court must also consider the statutory factors under 18, U.S.C.

11    § 3553(a).  Ultimately, Section 3553 controls, not the

12    guidelines.

13         The Government has filed a sentencing memorandum.  The

14    Government contends that the only sentence that is sufficient

15    but not greater than necessary to satisfy the factors set forth

16    in Section 3553(a) is a life sentence, or its equivalent.  The

17    Government argues that even though this is the first time

18    Mr. Brewster has been brought to justice, for at least three

19    years he has been receiving and possessing child pornography,

20    showing pornography to Jane Doe 1, who was then six to nine

21    years of age, to coax her into engaging into sexually-explicit

22    conduct and videotaping his abuse of her.  The Government

23    asserts that Mr. Brewster's difficulty with impulse control is

24    not a reason for leniency because it makes him even more

25    dangerous to the public.

1          In his response, Mr. Brewster points out his history of

2    mental illness and states that a bottle rocket injury to his

3    eye may have damaged his frontal lobe which could have resulted

4    in his poor impulse control and abnormal sexual behavior.  He

5    has been diagnosed with schizo-effective disorder,

6    depressive-type panic disorder with acrophobia, and

7    posttraumatic stress disorder.

8          While he admits that the nature and circumstances of his

9    offense -- his offenses are terrible, he cites the fact that

10   there is no evidence that he ever distributed the videos of

11   Jane Doe 1 on the internet or otherwise.  He argues that

12   although his life expectancy may be 37 years according to the

13   Social Security actuarial life tables, that table does not take

14   into account the stressors of prison life, which he contends

15   would shorten his life expectancy.

16         He asserts that he would be considered an elderly inmate

17   at the age of 50.  He states that a 40-year sentence will

18   effectively be a life sentence, which he maintains is greater

19   than necessary and which he believes should only be imposed

20   upon someone who has killed another person.  He asks for a

21   sentence of 15 years.

22         The Court will allow counsel to introduce any evidence or

23   add anything else to the arguments already made or expressed in

24   the sentencing memorandums.

25         Mr. Soliday.

 1          MR. SOLIDAY:  Your Honor, we have no evidence.  If I

 2  may make some argument.

 3          THE COURT:  You may.

 4          MR. SOLIDAY:  Your Honor, as you know, this is -- I

 5  know you read everything, so I'm not going to read my

 6  sentencing memo, but this is his first conviction of any kind.

 7  He did plead guilty to all the counts.  He didn't pick and

 8  choose which counts to plead guilty to.  He didn't put the

 9  victim through a trial, which would be a bad thing.

10      In 2009, the Social Security Administration found him to

11  be disabled with the disorders that you mentioned.  I do think

12  that the mental illness that he has is a mitigating factor and

13  not an aggravating factor.

14      Kevin was molested by two different people when he was

15  growing up, as the presentence report pointed out.  Obviously

16  that had some affect on his life here now and what he's done,

17  the crime he's committed.

18      Regarding the guideline calculation -- I mean, I know the

19  math is right, but if the calculation is over the statutory

20  max, then isn't the guideline inherently greater than

21  necessary?  I mean, I would argue that, that if the guideline

22  calls for life and the statutory max is 30, then the guideline

23  is out of whack, in my opinion.

24      Kevin did make a terrible mistake over a period of time,

25  but I don't think he should spend the rest of his life in

```
 1   prison, whether it's a life sentence or a term of years, which
 2   is effectively a life sentence.  I do truly believe that a life
 3   sentence should be imposed upon someone who actually kills
 4   another person and takes their life.
 5        Lastly, I ask that he be placed -- if you can make a
 6   recommendation that he be placed as close to home as possible.
 7        Thank you.
 8             THE COURT:  Let me ask you, as part of that
 9   recommendation, would close to home be the main factor, or
10   close to home facility to this area that could give him
11   treatment for various disabilities -- various problems he has?
12             MR. SOLIDAY:  If I could have a moment.
13        A place that has a treatment facility as close to home as
14   possible, yes, Your Honor.
15             THE COURT:  I think Terre Haute has a treatment
16   facility, I believe.  I'm not entirely sure, but I think they
17   do.
18             MR. SOLIDAY:  Okay.  Thank you.
19             THE COURT:  Mr. Brewster, do you agree with
20   everything that Mr. Soliday has said on your behalf, at least
21   so far today?
22             THE DEFENDANT:  Yes, sir.
23             THE COURT:  Do you wish to make a statement on your
24   own behalf at this time?
25             THE DEFENDANT:  No, sir.
```

1          THE COURT:  Do you want to stand by your letter that

2     you've sent to me?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Okay.

5       Ms. Koster.

6          MS. KOSTER:  Yes, Your Honor.

7       The Government would like to present evidence.  Before I

8     get to that, just so I don't forget, I'd like to respond to the

9     statutory argument that counsel just made.  He argues that

10    since the guidelines come out to life, and the statutory

11    maximum for a single count of production of child pornography

12    is 30 years, that that's out of whack.  But the defendant

13    didn't just commit one count of producing child pornography

14    here.  He committed four counts of producing child pornography,

15    and that's based on the evidence that law enforcement was able

16    to recover.  So, in essence, his statutory maximum in this case

17    is not 30 years.  It's 150 years.  It's 30 years on each of

18    Counts 1 through 4, 20 years on Count 5, and 10 years on Count

19    6 for a total of 150 years.  So Congress said the maximum is

20    150 years.  That's clearly a life sentence.  And the guidelines

21    say that the Court should give a life sentence.  So those two

22    are not in conflict at all.

23       I have many other arguments to make, but first I would

24    like to call Detective Janice Regnier from the Portage Police

25    Department briefly.

 1          THE COURT:  Ms. Regnier.

 2               JANICE REGNIER, WITNESS, SWORN

 3                    DIRECT EXAMINATION

 4   BY MS. KOSTER:

 5   Q.    Please state your full name.

 6   A.    Janice Regnier.

 7   Q.    Where are you employed?

 8   A.    The City of Portage Police Department.

 9   Q.    What is your title there?

10   A.    Detective.

11   Q.    How long have you been a detective with the Portage PD?

12   A.    Seven years.

13   Q.    Prior to that did you work in law enforcement?

14   A.    Yes.  I was in patrol for 11 years.

15   Q.    What is your total law enforcement service to date?

16   A.    I've been with the Portage Police Department for 21 years,

17   a merit officer for almost 18.

18   Q.    Detective Regnier, are you the lead investigator?  The

19   initial investigator in this case?

20   A.    Yes.

21   Q.    And, ultimately, did you refer the case to the FBI for

22   federal prosecution as well?

23   A.    Yes, I did.

24   Q.    Now, directing your attention to the early time period of

25   the investigation, who first reported the crimes to law

1    enforcement?

2    A.    The victims' mother came on station with Jane Doe 1.

3    Q.    And at that time, was the victim's mother interviewed?

4    A.    Yes.

5    Q.    I want to show you Government Exhibit 3.  Do you recognize

6    Government Exhibit 3?

7    A.    Yes.  That's a CD I made of the interviews.

8    Q.    And do you know which Jane Doe 1 or 2's interview is in

9    Government Exhibit 3?

10   A.    Number 1.

11   Q.    I want to show you Government's Exhibit 4.  Do you

12   recognize Government Exhibit 4?

13   A.    Yes.  That's the video I made of Jane Doe Number 2's

14   interview.

15   Q.    And is it standard procedure for your department to

16   videotape those interviews?

17   A.    Yes.

18   Q.    I just want to ask you a couple of background questions

19   about the interviews and how they're conducted.

20        Can you tell us if there are stages to a child forensic

21   interview such as those depicted on Government's Exhibit 3 and

22   4, what those stages are?

23   A.    Yes.  We use the RATAC protocol.  It's an acronym for

24   building rapport with the child; anatomy identification to get

25   common language between, you know, the interviewer and the

1   child on what they're talking about; touch inquiry so that you

2   get good touch/bad touch and their knowledge of that and

3   understanding; and then the abuse scenario where they disclose;

4   and then closure.

5       Sometimes a child will go immediately from building

6   rapport and identifying the anatomy or even skip the anatomy

7   and just disclose.  Those are kind of the guidelines to try to

8   get through steps if a child is being a little bit too shy.

9   Q.   Directing your attention to Government's Exhibit 3 and 4,

10  you were in the courtroom when excerpts were played earlier in

11  this hearing?

12  A.   Yes, I was.

13  Q.   And were those excerpts -- what part of the interview were

14  those excerpts?

15  A.   The abuse scenario.

16  Q.   Okay.  So we skipped over the part where you're

17  establishing rapport with the child and talking about anatomy

18  and those other things you mentioned?

19  A.   Yes.

20  Q.   Now, in talking about anatomy, did Jane Doe 1 and 2 use

21  different words to describe the defendant's genitalia?

22  A.   Yes.

23  Q.   How did Jane Doe 1 describe it?

24  A.   In two different sentences.  One was -- sometimes it was

25  private parts, other times it was pee-pee.

1  Q.   Okay.  And how did Jane Doe 2 describe it?

2  A.   As a potty.

3  Q.   In the interview of Jane Doe 2, she appears to be writing.

4  Can you explain what was taking place?

5  A.   Some children are more comfortable being able to write as

6  opposed to telling us.  So we will allow them -- the white

7  board you saw on the desk, we draw pictures, and it kind of

8  gives a little bit more rapport with the child.  But then

9  they're also able to draw things and write things, and she had

10 her own notebook, which made her comfortable.  So in that

11 situation, we allow the children to be as comfortable as

12 possible, and she was more comfortable writing her answers than

13 verbally, although sometimes she did both.

14 Q.   Now, she was in what grade at the time of that interview?

15 A.   She was preschool.

16 Q.   So was she able to write long words at that point?

17 A.   No.

18 Q.   When she had an answer that was more than just "yes" or

19 "no," how did she express it?

20 A.   Sometimes it was just like the first letter if she wrote

21 it, or she would -- if we questioned it, she would then clarify

22 what she was talking about.  Like, she put just a "P" for

23 preschool because she can't spell that.

24       MS. KOSTER:  Your Honor, the Government moves to

25 admit Government's Exhibit 3 and 4.

```
 1              THE COURT:  Any objection?

 2              MR. SOLIDAY:  No, Your Honor.

 3              THE COURT:  3 and 4 admitted without objection.

 4              MS. KOSTER:  They should be admitted under seal.  I

 5   should've said that.  Sorry, Judge.

 6              THE COURT:  Okay.  That request will be granted.

 7              MS. KOSTER:  Thank you.

 8   BY MS. KOSTER:

 9   Q.   How long after the mother of Jane Doe 1 and Jane Doe 2

10   reported to law enforcement what had happened, how long after

11   that occurred did you search the residence of the defendant?

12   A.   They came on station approximately 3:00 in the morning.  I

13   believe I went to the residence to make initial contact with

14   Mr. Brewster about 6:00 a.m. and then had other things I needed

15   to take care of on station.  And the victim's mother wanted to

16   go back to her family's house, I believe, in Chicago.  So we

17   made arrangements to do it later.  But from the time that

18   Mr. Brewster was taken into custody at about 6:00 a.m. until

19   they returned later on that evening, there was nobody else in

20   the house.  So probably three hours when he had -- was home

21   alone.

22   Q.   Did the defendant become aware that law enforcement had

23   been alerted about this activity?

24   A.   Yes.

25   Q.   How do you know that he was aware of that?
```

1  A.   Mrs. Brewster said that she had been texting him.  When I

2  talked to her about going to the house trying to ascertain how

3  we were going to make contact with him, she expressed a fear of

4  a weapon being in the house.  So we wanted to be safe for

5  everybody involved.  So I actually texted him with her phone to

6  get him to answer.

7  Q.   So you were in communication with him.  Did you identify

8  yourself as a law enforcement officer?

9  A.   Not through the text message, but once I knew he was in

10 the house, I called and identified myself as a police officer.

11 Q.   I want to direct your attention to Government's Exhibit 1.

12 Have you seen this before?

13 A.   Yes, I have.

14 Q.   And how did it come to your attention?

15 A.   In the week after Mr. Brewster was taken into custody,

16 Mrs. Brewster was essentially clearing out all his property,

17 and this was in a -- I believe it was in some kind of tote with

18 other pornographic material in, I believe, the garage.  And,

19 actually, if you flip it over on the other side, she had

20 actually folds it.  So when she hands it to him, and it says,

21 "Open now."  And then when he opens it is the other side.

22 Q.   So it was found like that?

23 A.   Yes.

24 Q.   And when you open it, the note inside reads --

25 A.   Yes.

```
 1    Q.    Can you read that into the record, please?

 2    A.    "If I suck your dick, can I play with Sarah?"

 3          MS. KOSTER:  Government moves to admit Exhibit 1.

 4          THE COURT:  Any objection?

 5          MR. SOLIDAY:  No, Your Honor.

 6          THE COURT:  Government Exhibit 1 is admitted without

 7    objection.

 8    BY MS. KOSTER:

 9    Q.    What is Government Exhibit 2?

10    A.    This is a list of questions that Jane Doe Number 1 had for

11    me for our second interview.

12    Q.    I don't want to go through all of the questions.  Can you

13    read the questions that stand out to you as most telling of

14    what Jane Doe -- at that point, Jane Doe 1 was going through?

15    A.    "Will I get to see my dad?  Am I going to change?  Will my

16    friends understand me still?  Will people that like to tease me

17    leave me alone now?  Are my feelings going to change?  Will I

18    ever be freer with only my mom?  Is he mad at me?  Is this my

19    mom's fault?  If you don't know how what really is happening,

20    what is best to help?  What's going to happen to my dad?"

21          I think there's one at the bottom.

22          "Will I always feel like throwing up?"

23          MS. KOSTER:  Government moves to admit Exhibit 2.

24          THE COURT:  Any objection?

25          MR. SOLIDAY:  No, Your Honor.
```

```
 1              THE COURT:  Government Exhibit 2 is admitted without
 2    objection.
 3              MS. KOSTER:  Nothing further for this witness, Your
 4    Honor.
 5              THE COURT:  Any cross-examination?
 6              MR. SOLIDAY:  Yes, Your Honor.
 7                          CROSS-EXAMINATION
 8    BY MR. SOLIDAY:
 9    Q.   Detective, during the three hour time frame, Kevin was
10    texting with his wife, is that right, between 3 and 6 a.m.?
11    A.   There was some contact in there, yes.
12    Q.   Okay.  And so did Kevin's wife say that he was out of the
13    house during that time frame, 3 to 6 a.m.?
14    A.   I believe when I asked her -- well, we started trying to
15    plan on how to first contact him.  He wanted to meet outside
16    the house, like, at Dunkn' Donuts, and she had told him to meet
17    at the house because she didn't want to have the conversation
18    that they needed to have in public, and he agreed.
19    Q.   Okay.  So you're not positive that he was at the house the
20    entire three hours, correct?
21    A.   Well, actually, she left, I believe, at 10:00 or 10:30 the
22    night prior went to her family's.  They convinced her to come
23    back.  She came to our station at 3:00.
24    Q.   Okay.  But as far as when she left to when you folks went
25    to the house, you don't have any precise proof that he was in
```

1    the house, is that correct, because it was the cell phone she

2    was texting him on?

3    A.   Actually, when I took her back to the house, when I met

4    her back later on that evening, she had told me that she had

5    not been back to the house since she recovered the disks from

6    the ceramic cup on the mantle in the fireplace in the basement.

7    And there were other items up there, and there were other

8    movies around, innocuous movies most of them.

9         When we went back later on that evening, all that was

10   gone.  It was moved.  There were things that were in a drawer

11   that weren't in a drawer when she left the house at 10:00.  So

12   she said that obviously somebody had moved them because she had

13   all her children with her.

14             MR. SOLIDAY:  Okay.  No other questions, Your Honor.

15             MS. KOSTER:  Nothing further.

16             THE COURT:  Thank you.

17        Let's do this.  Let's take a short break.  About a

18   ten-minute break.  So don't anybody go very far.  Be right back

19   in here shortly.

20        (Break.)

21             THE COURT:  Ms. Koster, go ahead.

22             MS. KOSTER:  Judge, at this time, the mother of Jane

23   Doe 1 and Jane Doe 2 would like to read a statement to the

24   Court.

25             THE COURT:  Okay.  Have her come up here.  She can

1    read from up here.

2             MS. KOSTER:  Can she read it from here, Your Honor?

3             THE COURT:  Yeah.  She can read it from there.  Go

4    ahead.

5             MS. KOSTER:  Okay.  Thank you.

6             MRS. BREWSTER:  Your Honor, when I was told that I

7    could write something to you prior to the sentencing of my

8    soon-to-be-ex-husband, I sat down so many times to pour my

9    heart out and try to give you a peak into our lives; however,

10   the words just hurt so much.  It's not easy to continuously

11   re-live the events that have brought us to where we are today,

12   but I'm begging you to never let this monster be released.

13        I remember that Mother's Day weekend of 2012 like it was

14   yesterday.  It was a very long and painful weekend that will

15   forever be etched in my mind.  The girls came home from the

16   neighbors after playing for the day.  Jane Doe 2 came in and

17   brought up how her daddy made her take a shower with him and

18   made her lick his pee-pee, and she didn't know why.

19        She then said that he made Jane Doe 1 drink his pee and

20   other stuff, but Jane Doe 1 didn't want to tell me because she

21   did not want to ruin my Mother's Day.

22        Jane Doe 1 jumped up and did not want to talk about it.

23   She then went to take a shower.  When she got out and had red

24   eyes, I asked her if she had got soap in her eyes.

25        She said, "No."

1    Then I asked her why she was so upset with what her sister

2   had said.  It was then that she admitted that everything Jane

3   Doe 2 said was true.  She wanted to wait until after my

4   Mother's Day weekend to tell me.  She had a good touch/bad

5   touch session at school and learned that what had been

6   happening with her and her father was unacceptable.  She

7   explained that he had videotaped them sometimes and made her

8   get my camera to do so.  He would take my memory card out and

9   replace it with his own.  It was at this point that she

10   explained that she was worried about her sisters but believed

11   that he left them alone because she was the one that he was

12   doing what he wanted.

13    She also said that she did not say anything before because

14   her father would remind her how he was the person protecting

15   our family and keeping us safe.

16    If she told mommy, then he would go to jail, and who would

17   protect us then?

18    This was the day that I found the memory cards and the

19   videotapes and saw things no mother should ever have to see of

20   her daughter and so-called husband.  I saw things in those

21   videos that I will never be able to un-see.  To see your

22   innocent child do things like that and try not to see it every

23   time you look at her.

24    Just to hear her say these things was painful, but then to

25   look and find the video, to see her sucking on his penis like

1   she had been doing it for so long and really knew what she was

2   doing.  To see him pushing her to do this.  To see the

3   background of our bathroom, to see his blankets, all of it made

4   it real, undeniable, and true.

5        I still am plagued by the visual evidence, not just of the

6   videos, but of a small piece of paper that was found written by

7   my daughter.  All it said was, "Dad, if I suck your dick, can I

8   go play with Sarah?"

9        How is it possible for a child to write something so

10  little to burn so deep in my head?  These words will just pop

11  in my head and make me breakdown and cry.  My daughter still

12  questions herself and why he did the things he did to her.

13       She is an exceptionally smart girl; advanced in so many

14  ways beyond her age.  She is upset and angry at herself for not

15  knowing it was wrong for so long.  But what child would ever

16  think that their own father, their flesh and blood, the one

17  that is supposed to protect them and constantly reminded her of

18  how he kept our family safe.

19       What hurts the most is knowing that my daughter thought

20  the things she was doing was normal, like cleaning her room.

21  She did not like it, but she had to.  She thought it was his

22  way of showing her love.

23       My children have lost so much more than just their father.

24  They have lost their innocence.  My oldest has gone through

25  having to repeat the embarrassment with her father to multiple

1    therapists, psychiatrists, teachers, friends, and the

2    principal.  She now has dealt with things that not all of her

3    friends can accept.  She has come home several times upset and

4    screaming at her sisters and myself to find out that she was

5    having a hard time and being bullied by girls at school because

6    of what she has been through.  She sometimes asks me, "Do they

7    know?" before someone comes to our house or she goes to see

8    someone.

9        She lashes out sometimes from the pain.  She will have a

10   tantrum, cry, scream, and not be able to explain why.  It can

11   be very heartbreaking and frustrating.  Sometimes, because I am

12   a mom and am supposed to have the answers and cure for

13   everything, no pressure.

14       When I have had to see him, I no longer see the man that I

15   married over 15 years ago.  The man that I fell in love with

16   was a man working 60 to 80 hours a week as a commander for a

17   security company that his father was the vice president.  I was

18   working full time at Robert Morris University and completing my

19   degree while he was working double and triple shifts for about

20   four years.

21       He always was aware of everything going on around him.  He

22   always made me feel safe and protected.  The day we found out

23   that I was pregnant with Jane Doe 1 was the day that he went to

24   work and ended up getting fired.  It was from this day that the

25   depression seemed to start taking more control of him.  He

struggled over time to leave the house for periods of time, but he always was able to take care of Jane Doe 1 and get her to school.  He was no social butterfly, but he did what was needed.

Shortly after Jane Doe 1 was born, he began having panic attacks; therefore, we moved in with his parents to insure that there was always someone around in case they were needed.  His mother was always at home and available to assist in childcare. He then applied for disability in an effort to help with our household debts and in recognizing that he was not capable of working anymore; however, this was a fight because he did not consistently see doctors for care.  He struggled to take the prescribed medication because of fear that he would not be coherent enough to tend to the children.

He is now just a shell that has done irreversible damage to so many people and shows absolutely no remorse.  He has taken my faith and trust and made me doubt and question everyone and everything around me.  I am not able to fully enjoy and have total happiness because there is always the fear of something going wrong.

I put all of my trust and love into our relationship, and it was all full of lies and manipulation.  I used to be a strong, independent woman when I was married that was always helping everyone around me.  When he was arrested, this person was taken from me.  I am still strong and independent but not

1   the same person I was.  I have had to change in so many ways

2   starting with learning how to ask and receive help.

3         I now am left to try and bring Jane Doe 1 back to a

4   childhood that was taken from her beginning at the age of

5   three, the believed beginning of her abuse.  It has been

6   described to me by one of her psychiatrists that this is why,

7   when she has her tantrums, she reverts to acting like a

8   three-year old.  She will whine and cry that she needs her

9   mommy and makes me feel horrible every time.

10        My children have lost an entire family because everyone

11   was forced to take sides.  This monster has broken an entire

12   family with years of abuse.  He has not just changed my

13   daughters' lives forever but so much more.  He has stolen my

14   girls' innocence and childhood.

15        Jane Doe 1 has had a great problem with directing her

16   anger incorrectly towards myself and her sisters rather than

17   towards what has happened.  She has had to learn how to express

18   herself appropriately for her age.  She has trouble letting me

19   go because she is afraid something might happen to her or that

20   I will not come back.

21         In the beginning, after his arrest, she would not let me

22   leave the bathroom when she was in the shower because he used

23   to go in there too.  She did not feel safe.  She has not been

24   able to spend the night at friend's houses since he has been

25   arrested due to fear of being away from me and abandonment

1   issues.  She feels that if I am not with her, something could

2   happen because her father never did anything to her when I was

3   around.

4       To hear my daughter say to me that her father had -- what

5   her father had done to her and for so long, that he had

6   videotaped her so many times.  To hear her explain what he

7   would make her do just to go out and ride a bike or play with

8   friends.  She would have to do something to him so she could do

9   anything - play with her friends, ride her bike, play outside,

10  be a kid.

11      After he was arrested and no longer in the house, it broke

12  my heart when she kept asking if she could really just go

13  outside and play, no expectations.  This was a whole new

14  concept to her because she never had this freedom.  She has a

15  huge fear of abandonment after losing her father.  What he has

16  done and been convicted for cannot go unforgotten.  I do not

17  think that there is any amount of years with him behind bars

18  that will ever make right what has been taken from all of us.

19      I face every day with new challenges because of him:

20  Financially, emotionally, physically, and socially.  My life

21  itself has changed in so many ways.  I have lost my job and

22  benefits at Robert Morris University where I was a financial

23  service adviser and worked for almost 17 years due to the

24  stress of keeping myself and my family together; missing so

25  much time from work for appointments with lawyers, court dates,

1  childcare issues, and counseling for myself and my children.

2  The security of my job is gone, and now I have to depend on the

3  support of family, friends, charity groups, and federal

4  programs.  I have learned what true depression really is.  I

5  used to be what most would call a social butterfly, constantly

6  helping everyone around me whether it be with baking,

7  volunteering time, or more as a counselor.  My students and

8  coworkers constantly came to me because they felt comfortable

9  and felt that I was a great listener; however, after learning

10 what he had done to my girls, a part of me is forever broken

11 and cannot be mended.  I fear of giving all of me to anyone

12 ever again.  I never want my girls or myself to be hurt the way

13 that their father did.  I have had to learn how to comfort and

14 support my girls on my own.  When they cry, yell, fight,

15 scream, or refuse to do a chore like clean their room, I always

16 wonder if it is because of what they have been through or just

17 because they're acting out like every other kid.

18     This can really make it hard to discipline them out of

19 fear that they may lash out more if it is a flashback, and

20 that's not fair to them or to myself.

21     In the beginning, when I would ask Jane Doe 1 to clean her

22 room or help out with something, she would constantly remind me

23 that dad would make her do that.  Or she would say, "Six years,

24 Mom.  Six years," constantly reminding me of the pain that she

25 suffered and for so long at the hands of her father.

```
 1        I thank God every day for taking him away and helping me

 2   to stop him from what he was doing.  No amount of time will

 3   ever be enough to fix him.  I fear that if he ever did get out,

 4   he would come after me for revenge and make sure that he does

 5   not suffer alone.

 6        He has always said that he could not live without us.  In

 7   this case, I'm putting all my faith in you and that you will

 8   put this monster away for a very long time and keep us safe

 9   from him.

10        Thank you.

11             THE COURT:  Thank you.

12        Do you have any other victim statements?

13             MS. KOSTER:  Yes, Your Honor.  Jane Doe 1 is going to

14   read a statement as well.

15             THE COURT:  Okay.  She can read it from the same

16   place likewise.

17             MS. KOSTER:  There were a few incidental references

18   to the names of the victims in that statement, and I just ask

19   that they be stricken from the record and replaced with Jane

20   Doe 1 and Jane Doe 2.

21             THE COURT:  That'll be done.

22             MS. KOSTER:  Thank you, Judge.

23             JANE DOE 1:  Your Honor, my father, Kevin Brewster,

24   may look innocent on the outside, and he might just be in your

25   eyes, but if you watch any part of the evidence, he might be
```

1    proven a monster for over a period of over six years.

2        The reason I am reading this to you is because I want to

3    tell you again what I've been through even though you've had

4    cases like this probably over 1,000 times and already know very

5    well.

6        I realize that a lot of things have been taken from me

7    over the years, and I am always noticing more, like a great big

8    chunk or piece of my heart, a lot of courage, a true biological

9    family, a true loving and caring father, a lot of my

10   determination, concentration, and much more.

11       I also struggle to work on assignments at school as well

12   as focus on them, and I am a straight A student.  What he has

13   put us through has cost me many true friends as well as my

14   mom's job.

15       When my father first got arrested, I cried a lot for the

16   man who was my father.  As time has past, I struggle to cry.

17   Instead of crying, I receive waves of anger and lash out.

18   Nothing really triggers the waves of anger or fits of rage.

19   They come at ungiven and surprising times.  For example, I can

20   be having a great time with my friends, and in a blink of an

21   eye yell at them for no reason.  Then I would come to my

22   senses, and my friend won't talk to me.  Sometimes it's almost

23   as if I blackout, and I won't know what I'm doing or won't

24   remember what I did.  It's not fair to them or me.

25       When my father was around, things were way different than

what they are now.  He would just be at home watching and
yelling at us while our mother would be an hour away working.
Sometimes it felt like I was locked inside or outside of my
house because of what was happening inside the walls.  Since my
father always had problems being in public, I was almost never
allowed to go to friends' houses or join in on after-school
activities.  I would get yelled at a lot because my father was
full of frustration and anger.  Sometimes I thought he was full
of rage because I wasn't the kind of child he wanted.  Too
smart, too dull, not smart enough, that it was just him, or
just because he simply didn't want kids of his own flesh and
blood.

In a way, I was scared of my father because if he was full
of rage, he would threaten to send me away to an orphanage or
asylum.  I would believe him, too.  That was usually if he
wanted me to do something to him or for him.  As the older
sister, I felt it was my job to protect my sisters from what my
father could do to them.  I was constantly worrying about what
was happening at home and could never really have a good,
worry-free time.  Too many negative possibilities would run
through my head.  Now I am much more care-free and worry-free.
I am in more clubs than most people in school and have great
times.

I thought that what my father was doing was normal in
everyday households.  So I didn't know it was wrong; otherwise,

1   I would've told sooner, but I was young.  So I didn't know any

2   better.

3       I am constantly going through therapists like birds

4   migrate south for the winter, not because of me, but because of

5   what my father did.  My case, it is too much for some people to

6   bear.  At least I'm going to a good one now.

7       I also have a counselor at school I have to go to on a

8   once-a-month basis.  Kids in my class know about it and think

9   that it is just to ditch certain classes when, to me, it is

10  like adding a class to the school day.

11      I get bullied a lot.  I don't really know why, but my mom

12  says it's because a lot of people want to be me, but I don't

13  know what for.  It's not physical or anything, but a lot of

14  side comments and sneers from the same person, and it bothers

15  me.

16      The day after my father got arrested, I went to my

17  neighbor's house.  Me and my neighbor were close.  She is a

18  year younger than me.  Since we were close, she was the first

19  person I confided in.  That day was not a typical day with your

20  friend.  It was like reliving what my father did.  My neighbor

21  locked me in a room, spread my arms and legs, and played a game

22  she liked to call tickle torture.  She would touch your common

23  private parts and laugh like an evil villain about to blow a

24  town off of the map.  This is one of my many problems with her

25  and a big reason why we aren't friends anymore.

```
 1          About a week after my neighbor played tickle torture, I
 2     saw my Aunt Kate at the beach.  I ran to her, and she hugged me
 3     and wouldn't let me go.  She just kept crying and crying and
 4     saying that my father had done the same thing to her and abused
 5     other people too.  She said she tried to get help, but no one
 6     would listen to her.  I hope this helps you make an accurate
 7     decision about my father.  He is my father, and I forgive the
 8     man that was once my very own true father figure, but I could
 9     never forgive the un-father-like person who abused me in
10     several ways.
11          I thank the people who are here and supporting me, even
12     the people on my father's side.  They might not know it, but
13     they are supporting the building blocks for my better future
14     and well-being.  They know they care, and it might just be
15     deep, deep down in their hearts.
16          My mom raised me to talk the truth, and if she didn't, I
17     wouldn't be sitting here right now telling you my opinion and
18     how I feel.
19          Thank you for listening and hear me out.
20          THE COURT:  Thank you very much.
21     Do you have any other witnesses?
22          MS. KOSTER:  No other witnesses, Your Honor.  Just
23     some argument.
24          I want to pick up where I left off at the very beginning
25     addressing the statutory argument by defense counsel.
```

1        So Congress says that the maximum sentence that the

2    defendant should receive is 150 years for these crimes, and the

3    guidelines call for a life sentence for his crimes.  I want to

4    explain and further refute the defendant's argument that the

5    Government somehow has engaged in some kind of misconduct, or

6    the suggestion that charging multiple counts in this case was

7    somehow inappropriate.

8        Both the guidelines and Congress recognize that every

9    instance that a child is used to make child pornography causes

10   further harm to the child.  The Government in this case charged

11   a single count for each day that we could prove that the

12   defendant engaged in sexual acts and videotaped them featuring

13   a minor.  That is how we charge every production of child

14   pornography case where we can prove up multiple instances.  For

15   example, the Government -- we have a case pending against a

16   defendant in front of Judge Simon where he produced so many,

17   hundreds of thousands -- well, thousands of videos that, rather

18   than charge every single day because that would have resulted

19   in probably a thousand counts, what we did was charge every

20   year because the conduct took place over a long period of time.

21   But the reason for doing that is because the defendant should

22   receive greater punishment because he produced more child

23   pornography than someone who took a single picture, and that's

24   what the guidelines say when they say that these counts should

25   not group together, and that's what Congress intended.

 1          I would also point out, as the defendant notes, that

 2     there's no evidence that he distributed the videos that he

 3     produced.  That's true as of today.  We have not found evidence

 4     that these images or videos have appeared anywhere else.  But,

 5     Your Honor, you may recall a defendant by the last name of

 6     Vasquez who appeared before Your Honor for sentencing.  He

 7     produced child pornography as well.  And, in that case, the

 8     Government and he agreed to recommend the particular sentence

 9     to the Court.  And as stated in the sentencing memorandum of

10     the Government, it was motivated greatly by the fact that

11     Mr. Vasquez, in order to prove the charges against him, we

12     would have had to call the child victim to testify, who was

13     quite young.  That was different than in this case where the

14     defendant's face is visible in the videos, and so we would not

15     have had to call the victims to testify as to who was sexually

16     abusing them.  The defendant also has characteristics, tattoo,

17     and other things that can be seen in the video that prove that

18     it's him sexually abusing the victim in this case.

19          But I bring up the Vasquez case because at the time the

20     Government offered its plea and at the time of sentencing, the

21     Government did not know that, in fact, he had distributed the

22     child pornography that he produced.  We did not find that out

23     until after the sentencing hearing.  So just because we have

24     not learned that today doesn't mean that it didn't happen.  In

25     other words, I'm not saying it did happen.  I'm just saying

1    it's true we don't have proof that he did distribute the child

2    pornography he produced, but that doesn't mean that we won't

3    later learn that he did.

4        The guidelines right now do not increase the defendant's

5    sentence for distribution of child pornography.  So I'm not in

6    any way suggesting that that possibility means he should get a

7    higher sentence.  I'm just saying that the fact that there is

8    no proof of it today also isn't mitigating, Your Honor.

9        I want to discuss the diminished capacity argument that

10   the defense raises.  First, the Government doesn't concede that

11   this defendant suffers from diminished capacity, and perhaps I

12   should've flushed that out a little bit better in the

13   sentencing memorandum.  Under the Durham case, which is cited

14   by the defense in their brief, in order to find diminished

15   capacity, this Court would have to make a finding that, number

16   one, the defendant could not understand the wrongfulness of his

17   behavior or control that behavior at the time of his offense;

18   and, two, that that significantly reduced mental capacity

19   contributed substantially to the commission of the offense.

20       So, Your Honor, as to number one, did the defendant

21   understand the wrongfulness of behavior or control -- was he

22   able to control that behavior at the time of the offense?  The

23   evidence clearly shows that he did.  He told Jane Doe 1 not to

24   tell her mother what he was doing with her.  That's a

25   recognition that what he was doing was wrong, and that if she

1  told someone, he would get in trouble for it.

2      Was he able to control his behavior at the time of the

3  offense?  He clearly was.  The defendant did not sexually abuse

4  the victim or her sister when her mother was home.  He was able

5  to control himself when the parent, the other parent to the

6  children, was in the residence; however, it was when she was

7  away from the residence that he took advantage of the

8  opportunity to sexually abuse his daughters.  So he clearly was

9  able to control his behavior.

10     Further I would note that in the defendant's own

11 sentencing memorandum, they point out that since he's been

12 incarcerated in Porter County jail, the defendant has been in

13 no trouble with the staff and has had no write-ups nor any

14 disciplinary actions filed against him.  You'll see that in the

15 defendant's brief, which is docket entry 48 at page 4.  That

16 again shows that this defendant is clearly able to control his

17 behavior.

18     As to number two under the Durham case, the defendant

19 offers no evidence linking these diagnoses that he has had in

20 the past with conduct in this case.  There's no evidence that

21 being paranoid schizophrenic means that you're a pedophile.

22 There's no link between his psychological illnesses and his

23 conduct.  So there's no evidence that his significantly reduced

24 mental capacity, if we could call it that, contributed

25 substantially to the commission of his offenses.

1      Further, if the Court were to find that the defendant

2   suffers from diminished capacity, the guidelines specifically

3   state that the Court should not depart downward based on

4   diminished capacity where, quote, "The offense involved actual

5   violence or a serious threat of violence, or where the

6   defendant has been convicted of an offense under Chapter 110 of

7   Title 18," which is the charges, all of the charges, six

8   counts, the defendant in this case faces.

9      So the guidelines specifically state in Section 5K2.13

10   that diminished capacity is not a valid ground to depart

11   downward in this type of case.

12      Furthermore, as argued in the Government's sentencing

13   memo, even if this Court were to find that the defendant did

14   suffer from diminished capacity, and even if the Court were to

15   disregard the guidelines and find that that justified a

16   downward departure, based on Judge Posner's reasoning in the

17   Garthus case, the defendant's lack of impulse control and other

18   mental problems doesn't justify a downward departure in any

19   event because when it comes to behavior that is driven by

20   sexual desires, diminished capacity further weakens the ability

21   to resist making the individual even more dangerous than

22   someone who has the same desire but doesn't suffer from that

23   diminished capacity.

24      I'm not arguing that his mental problems should cause him

25   to receive a more serious sentence than the guidelines

 1    otherwise call for.  That's not the Government's argument.

 2    We're not seeking an above-guideline sentence.  We're seeking a

 3    guideline sentence, and the guidelines in this case call for

 4    life.

 5         Just so the record is clear, the Garthus case is -- the

 6    citation is 652 F.3d at 715, and the case that I reference,

 7    which is also cited by defense counsel at page six of the

 8    defendant's sentencing memorandum, docket entry 48, is the

 9    Durham case, which is 645 F.3d 883.  Those are both Seventh

10    Circuit cases from 2011.

11         In the defendant's sentencing memorandum, he repeats his

12    claim that he is a first-time offender.  Today defense counsel

13    used the term, "First conviction."  And I agree that that's

14    accurate.  This is his first conviction, but he is by no means

15    a first-time offender.  This is not this defendant's first

16    rodeo.

17         You heard during the statement of Jane Doe 1 that the

18    defendant's sister disclosed to Jane Doe 1 that she had been

19    sexually abused by the defendant.  Even if the Court were to

20    discount that information because it occurred out of court, and

21    witnesses other than Jane Doe 1 didn't testify to it, just

22    based on the testimony and evidence that you have seen in this

23    case, you know that this is not the -- this was not a first-

24    time offense.  In other words, if the defendant had sexually

25    abused Jane Doe 1 once and then had been arrested and charged

1   with it, then maybe we can call him a first-time offender, but

2   this conduct took place over a period of years.

3        According to Jane Doe, it happened three to four times per

4   week for years, and the Court has credited that testimony.

5        In addition, according to Jane Doe 2, it happened more

6   than five times.  So, in reality, the defendant was a serial

7   molester much in the same way as Jeffrey Dahmer was a serial

8   killer.

9        In my sentencing memorandum, contrary to defendant's

10  suggestion, I'm not comparing the defendant to Jeffrey Dahmer,

11  comparing his crimes.  There's obviously different individuals

12  in different crimes, but the point is by the time they were

13  arrested and prosecuted, neither of them were first-time

14  offenders.

15       I would also note that had the defendant been prosecuted

16  for sexually abusing his sister, if that did occur, 18, U.S.C.

17  3559(e) would mandate a life sentence in this case.  I don't

18  know if you're familiar with that provision, Your Honor, but

19  18, U.S.C. 3559(e) is titled, "Mandatory Life Imprisonment for

20  Repeated Sex Offenses Against Children."  And it states that a

21  person who is convicted of a federal sex offense in which a

22  minor is the victim shall be sentenced, shall be sentenced to

23  life imprisonment if the person has a prior sex conviction in

24  which a minor was the victim unless the sentence of death is

25  imposed.

1          So Congress there is clearly contemplating that a life

2     sentence is appropriate for somebody who sexually abuses

3     multiple children, which is exactly what we have in this case.

4     Even if you set aside Jane Doe 2 and the testimony about the

5     defendant sexually abusing his sister, we have two victims from

6     whom the Court has heard in this case through their interviews

7     with law enforcement and whom the Court has already credited as

8     credible who have provided information about being sexually

9     abused by the defendant.  So Congress contemplates a life

10    sentence for individuals who are twice convicted of those

11    crimes.

12         There is a lot of talk in the defendant's letter that he

13    wrote to the Court and in the letters written by others on his

14    behalf about his parenting abilities, and it is claimed that he

15    was a good father.  And, Your Honor, I would submit to the

16    Court that when a person sexually abuses his own children, he

17    loses the right to claim that he is a good father.

18         There is a case called *United States vs. Irey* out of the

19    11th Circuit.  It was decided in 2010.  The background of the

20    case is that the district court had sentenced the defendant, I

21    believe it was to 17 years, or 17 1/2 years, for producing

22    child pornography and sexually abusing multiple children.  And

23    the 11th Circuit reversed the sentence finding it to be

24    unreasonable and concluded that the only sentence that was

25    reasonable is the maximum called for under the guidelines in

```
 1    that case, which was just 30 years because the defendant had
 2    faced only a single count of production of child pornography.
 3    And in reaching that decision, part of what the 11th Circuit
 4    addressed was comments by the district court that other than
 5    his criminal conduct, this defendant, his history and
 6    characteristics, were -- he was a family man, and he was a
 7    solid member of the community.  And they stated -- I'm going to
 8    read from their decision.  I just have the slip copy of it,
 9    Your Honor.  It was decided July 29th, 2010.  They say, "To
10    begin with, the judge's reasoning is like saying that other
11    than the fact that he had a, quote, illness that made him want
12    to kill young women, Ted Bundy was a pretty nice guy and a
13    valuable member of his community."
14        That not only could've been said about Bundy, they say,
15    but actually that claim was made about Bundy.
16        They also go on to say, "The district court's reasoning is
17    also like saying that but for his taste for human flesh and how
18    he satisfied it, Jeffrey Dahmer was not so bad.  The simple,
19    expedient of assuming away or putting out of mind all of the
20    criminal acts that they have committed, one may describe many"
21    -- I'm sorry -- "by the simple expedient of assuming away or
22    putting out of mind all the criminal acts that they have
23    committed, one may describe many, if not most criminals, as
24    good people without, quote, 'any other sort of criminal conduct
25    or conduct representing poor character.'"
```

1      They go on to state that, "The defendant in that case,

2    Irey, did not merely slip up and commit one criminal act.  He

3    abused children and recorded his sexual abuse in the basement

4    of the children in photographs and videos for his own personal

5    enjoyment.

6      "No one who commits such heinous crimes has good character

7    regardless of whether they're criminal.  While he was not

8    raping, sodomizing, and torturing helpless children, was a good

9    father, or husband, or member of his community.

10      "It was unreasonable and a clear error in judgment to vary

11   downward for Irey on the theory that he has good character."

12      They go on to discuss a Fourth Circuit case that

13   essentially reached the same conclusion, that that case was a

14   terrorism case where the Fourth Circuit concluded and the Irey

15   Court quotes them.  They say, "What the Fourth Circuit said

16   applies as well to this case in what Irey did.  This is not

17   good character as we understand it.  If Irey is a person of

18   good character, the term has no meaning worth mentioning."

19      And I would submit, too, Your Honor, that if this

20   defendant is a good father, then that term has no meaning worth

21   mentioning.

22      It is also notable -- and this is a point made in the Irey

23   case as well -- that the fact that the defendant was able to

24   abuse his children for so long before he was caught, which ties

25   in with his first offender argument, should not work to his

1    benefit because what it shows is that he was able to lead a

2    double life.  He was able to make the people around him think

3    that he was a good father, and then he was able to sexually

4    abuse his children and threaten them with reporting the abuse

5    so that he could continue to sexually abuse them in the future.

6        When the defendant talks about his life expectancy in

7    prison and how conditions there are likely to lower his life

8    expectancy, and he bemoans the fact that he'll be isolated from

9    his family and friends in prison, it's an interesting argument

10   because the evidence in this case shows that the defendant

11   chose to isolate himself from his family and friends for years.

12   He lived in the basement of his residence.  He rarely came out.

13   And during that time, other than his victims, he didn't see

14   very many family and friends.  In fact, I think it's clear in

15   the letters that he considers himself to have had really only

16   one friend in his lifetime.  He did all of that so that he

17   could sexually abuse his own children in the privacy of his own

18   home.  It seems fitting, Your Honor, that this defendant should

19   be isolated away from the victims in this case, isolated away

20   from the rest of his family and away from his friends as

21   punishment for his heinous criminal conduct in this case.

22       I want to address momentarily the kinds of sentences that

23   are available under 3553.  This Court has sentenced a number of

24   people who have produced child pornography, and in some of

25   those cases, the Government has entered into plea agreements

```
 1   with the defendants.  I made this point earlier but want to
 2   remind the Court that oftentimes, when the Government agrees to
 3   recommend a sentence that is below or potentially below the
 4   sentencing guidelines, it's doing that to avoid a trial because
 5   the facts of the case would force a very young person to take a
 6   stand, take the stand and testify under oath, which is a very
 7   difficult thing for a young person to have to do, and to be
 8   subject to cross-examination in the same room as their abuser
 9   is a very difficult thing.  So I would urge the Court not to
10   compare this case to cases where the Government has recommended
11   a particular sentence because there are reasons the Government
12   has done that, and it's primarily to avoid a trial for the
13   victims in the case.  That was the case in the Vasquez case,
14   Your Honor, that I mentioned previous.
15        Your Honor also recently sentenced a defendant by the last
16   name of Filbey who had multiple production of child pornography
17   counts.  And in that case, the Government agreed to recommend a
18   sentence that was in the middle of the guideline range.  I
19   believe it was 27 1/2 years for Mr. --
20             THE COURT:  28 1/2 years.
21             MS. KOSTER:  Okay.  28 1/2 years.
22        I would note, Your Honor, that in that case, the victims
23   were significantly older at the time that they were sexually
24   abused.  Filbey, although he was a father figure to them, and
25   he was the boyfriend of the mother of the victims, he was not
```

1   their father.

2            THE COURT:  They treated him as his father.

3            MS. KOSTER:  They did.  He was a father figure, like

4   I said, but they have a father.  They had a father who lived

5   separately from them who is still very much a part of their

6   life.  You might've remembered that they referenced him during

7   the hearings.

8            THE COURT:  Right.  Not at the time the conduct was

9   taking place.

10           MS. KOSTER:  Well, he was still their father.  He

11  just wasn't playing a very big role in their life.

12           THE COURT:  Almost no role.

13           MS. KOSTER:  Correct.  I would agree with that, Your

14  Honor.  I think that's accurate.  But it is still a different

15  thing, I think, altogether to sexually --

16           THE COURT:  Let me ask you about Filbey since you

17  brought it up.

18           MS. KOSTER:  Okay.

19           THE COURT:  Filbey, on the other hand -- because

20  you're getting to the point that I was going to ask you anyway.

21  The Government agreed in that case of 28 1/2 years would be an

22  appropriate sentence with the defendant.

23      Filbey did -- here we don't know about the distribution.

24  We know of no distribution point, but you make a good point,

25  that that can surface later.  We don't know at this point.

 1          Filbey, on the other hand, had massive distribution of

 2     those pictures of the two girls, and they talked about the

 3     effect that the distribution has had on their life likewise.

 4          MS. KOSTER:  And there's no doubt that that has its

 5     own impact and can prolong, you know, the suffering of the

 6     victims in the case.  I would agree with that.

 7          THE COURT:  Well, the one that -- the ones who

 8     testified -- I don't think they both -- I think they both

 9     testified, I think.  But one in particular I remember addressed

10     Mr. Filbey very strongly, and her thing was that every time she

11     sees somebody looking at her, she thinks it probably become --

12     they saw her picture on the internet, and she also is unable to

13     deal with men in her life as she was before.

14          MS. KOSTER:  Right.  I think --

15          THE COURT:  And she talked about the effect that that

16     had on her life, and that was -- not only what he did to her,

17     the production, but also the distribution.

18          MS. KOSTER:  Right.  And for that distribution,

19     Mr. Filbey received an enhancement at sentencing, and so he was

20     punished more greatly in that case because of the distribution.

21      I'm not asking you to punish Mr. Brewster more greatly

22     because of distribution because I can't prove that he

23     distributed.  I'm just saying it doesn't give him a discount

24     either.  It shouldn't give him a lower sentence than what the

25     guidelines call for simply because he didn't distribute.

```
 1        Also, I think it's important to note in the Filbey case,
 2   Your Honor, that the victims, although the images that
 3   Mr. Filbey created are sexually explicit, and the victims are
 4   lasciviously exhibiting -- engaging in a lascivious exhibition
 5   of the genitals, they're not engaging in sexual acts.  That is
 6   a very important distinction from the child pornography that we
 7   have here.  Here we have very young children who are the
 8   daughters, the biological daughters of the victim being forced
 9   to engage in sexual acts that are videotaped.  And I would
10   submit to the Court that that is much more serious conduct than
11   what was at issue in Filbey.  Because of the family
12   relationship, because of the age of the victims, they were
13   older in that case, and because the child pornography produced
14   here was much more explicit than that in the Filbey case.
15        Further, although Mr. Filbey did admit to touching the
16   victims -- there were hands-on offenses -- he did not engage in
17   sexual acts with the victims.  There was no direct sexual, you
18   know, penis-to-vagina contact in that case.  What he admitted
19   to doing and what they described was him touching their vaginas
20   with his fingers.  So that is different from the Filbey case.
21   So the sexual abuse -- and it didn't last as long.
22        The younger victim who recalled being touched, she
23   described it happening one time, and the defendant admitted to
24   that.  He also admitted to touching the other victim in her
25   sleep.  The other victim hadn't reported that.  She wasn't
```

 1   aware that it had occurred.  This abuse is not like that abuse

 2   when it comes to the actual physical conduct in the case.

 3       There is no question that Jane Doe 1 and Jane Doe 2 were

 4   well aware of the sexual abuse that took place.  There's no

 5   question that it happened for years in this case, and there's

 6   no question that there was direct contact between the genitals

 7   of the defendant and the victims in this case, or at least Jane

 8   Doe 1 described that, and he put his penis into the mouth of

 9   Jane Doe 2.  So the sexual abuse that occurs here is very

10   different from what occurred in the Filbey case.

11       Another example is the Fletcher case, Your Honor, that you

12   sentenced the defendant to 30 years incarceration.  In that

13   case -- and there was no plea.  Like this case, there was no

14   plea agreement in that case.

15       In that case, the defendant also guidelined at life;

16   however, there was no evidence in that case that the defendant

17   had committed a hands-on offense against the victim.  The

18   Government suspected it, but we couldn't prove it.  That was

19   clear at sentencing.  There was no sex acts that had been

20   recorded.  The production of child pornography that occurred in

21   that case was a young child, again, lasciviously displaying her

22   genitals after getting out of a bath, but there was no contact

23   between Mr. Fletcher and the victim in this case.  So no sexual

24   acts that took place between them.  In fact, no proof of any

25   hands-on offenses with Mr. Fletcher and the subjects of the --

 1   the subject of his child pornography.

 2       I would also note that Mr. Fletcher's sentence was, or at

 3   least under the guideline calculation, was increased based on

 4   other conduct that he engaged in after the investigation began.

 5   For example, his encryption software that he had loaded onto

 6   his computer and other activities, those things raised

 7   Mr. Fletcher's sentence guideline calculation to life, but they

 8   don't compare to what this defendant did.

 9            THE COURT:  How about Mr. Warden?

10            MS. KOSTER:  Mr. Warden, Your Honor, was convicted of

11   enticement of a minor.  That charge carries a ten-year

12   mandatory minimum sentence.  He agreed in a plea agreement to

13   35 years.

14            THE COURT:  He agreed to 420 months.

15            MS. KOSTER:  I believe that's 35 years.

16            THE COURT:  That's 35 years.  You're right.

17            MS. KOSTER:  Okay.  He had enticed a 14-year-old

18   minor.  That minor was not related to him.  And he also

19   possessed a boatload of child pornography.

20            THE COURT:  He also put the pornography, again, out

21   on the internet.  He advertised it for sale and things like

22   that.

23            MS. KOSTER:  He wasn't selling child pornography.  He

24   was distributing it via peer-to-peer programs.  There's no

25   exchange of money for that.

```
 1              THE COURT:  He was advertising it.

 2              MS. KOSTER:  I'm sorry?

 3              THE COURT:  He was advertising it out there for

 4   people to --

 5              MS. KOSTER:  He was offering it, yes, to other people

 6   via peer-to-peer programs.  He was charged with advertisement.

 7        I think it's important to remember about Mr. Warden is he

 8   did not produce child pornography.  He did not take pictures of

 9   any victims engaging in sexual acts.  What he did was entice a

10   minor to engage in sex who was 14 and did, in fact -- actually,

11   the second time around it was a law enforcement officer, and

12   that's how he was caught.  He had previously been convicted of

13   enticing a minor, who was also a 14-year-old female.  And so he

14   was a registered sex offender at the time he committed his

15   offense.

16        The fact that Mr. Warden was a registered sex offender

17   when he committed his federal offense caused an automatic ten

18   years to be added to his sentence under 2252.  I would have to

19   look up the subsection, but that statute says, Enticement of a

20   minor is this X, Y, and Z punishment.  But if you've been

21   previously convicted, if you are a registered sex offender at

22   the time you commit the offense, you automatically get ten

23   years consecutive added on to your sentence.  And that's why

24   Mr. Warden faced a mandatory minimum sentence in that case, if

25   memory serves, of 35 years, which is what the Government and he
```

1   both agreed to recommend, the mandatory minimum he was facing.

2        There was no -- and just to go back about Warden, to cover

3   your point.  There was no evidence in Warden of him

4   distributing child pornography that he had produced.  What he

5   was distributing is child pornography that he had obtained via

6   the internet.  So I think those circumstances are very

7   different from what we have here.  And, yeah, Mr. Warden got a

8   long sentence, but it's because he was a registered sex

9   offender at the time he committed his crimes largely that led

10  to such a high sentence.

11       I already mentioned Mr. Vasquez.  As I said before, we

12  didn't have proof of distribution at the time the plea was

13  offered or even at his sentencing, but we did obtain it later.

14  We received notification from the National Center for Missing

15  and Exploited Children that his images that he had produced

16  had, in fact, been distributed, although he had denied that

17  vehemently throughout the pending of the case.

18       You'll also recall that the victim in that case was

19  related to Mr. Vasquez, but you couldn't see his face in the

20  images that were produced.  And so as a result, the victim

21  would've had to identify -- she would've had to testify at

22  trial had the case gone to trial.  Because he was a relative,

23  not a father, but a relative of her, there was family turmoil

24  as a result of law enforcement getting involved.  And that also

25  played a role, as explained in the Government's sentencing

1    memorandum in that case, as to why the Government agreed to

2    recommend the sentence we did in that case.

3         For what it's worth, Your Honor, I think this is the worst

4    case that I've had before you for sentencing.  I think that the

5    conduct in this case is far and away worse than in any other

6    case that I have brought before this Court.  And I think it is,

7    with the possible exception of the one case I mentioned that's

8    currently pending in front of Judge Simon, the worst I've ever

9    prosecuted.

10        The Irey Court says it much more eloquently than I can.

11   So I would like to read a few more excerpts, if I can, from

12   their decision.

13        "Because the punishment should fit the crime, the more

14   serious the criminal conduct is the greater the need for

15   retribution and the longer the sentence should be.

16        "The seriousness of a crime varies directly with the harm

17   it causes or threatens.  It follows that the greater the harm

18   the more serious the crime and the longer the sentence should

19   be for the punishment to fit the crime.

20        "As we have stated before, child sex crimes are among the

21   most egregious and despicable of societal and criminal

22   offenses."

23        They cite to the Sarras case, S-A-R-R-A-S, 575 F.3d, 1191,

24   in which the 11th Circuit affirmed as reasonable a 100- year

25   sentence for a, quote, first offender, their description, who

 1  sexually abused a single 13-year-old girl and took photos of

 2  it.

 3      "Much has been said to describe and emphasize the grave

 4  harm that sexual abuse of children inflicts on its victims.

 5  Some of the best and most recent descriptions of that harm can

 6  be found in *Kennedy vs. Louisiana*, the Supreme Court case

 7  decided in 2008.  Although the Court, by a five to four margin,

 8  decided that capital punishment could not constitutionally be

 9  imposed for the rape of a child, all nine justices agreed that

10  sexual abuse of children inflicts enormous harm on victims.

11      "The majority acknowledged that here's the victim's

12  fright, the sense of betrayal, and the nature of her injuries

13  caused more prolonged physical and mental suffering than, say,

14  a sudden killing by an unseen assassin.

15      "The attack was not just on her but on her childhood.

16  Rape has a permanent, psychological, emotional, and sometimes

17  physical impact on the child.  We cannot dismiss the years of

18  long anguish that must be endured by the victim of child rape."

19      And, Your Honor, I would note that in this state, the

20  definition of rape is the penetration, however slight, of the

21  vagina of the child, which clearly occurred in this case, not

22  just with the defendant's fingers but also with his penis.

23      I think it also covers forced phallacial.

24      The four dissenting justices in the Kennedy case believe

25  that child rape was such a serious crime that death could be

1    imposed as punishment for it.  They stress the devastating

2    long-term effect that rape has on children.  And this is a

3    quote of the Supreme Court case at page 2677.  "The immaturity

4    and vulnerability of a child both physically and

5    psychologically adds a devastating dimension to rape that is

6    not present when an adult is raped.  Long-term studies show

7    that sexual abuse is grossly intrusive in the lives of children

8    and is harmful to their normal psychological, emotional, and

9    sexual development in ways which no just or human society can

10   tolerate."

11       Reading further from the Irey decision, Your Honor.  "Even

12   before the Kennedy opinions, the Supreme Court had long

13   recognized that childhood sexual abuse has devastating and

14   long-lasting effects on its victims."

15       They cite to the Ferber case in which the Supreme Court

16   said, quote, "It has been found that sexually-exploited

17   children are unable to develop healthy, affectionate

18   relationships in later life.  They have sexual dysfunctions;

19   have a tendency to become sexual abusers as -- and have a

20   tendency to become sexual abusers as adults.  The damage to

21   children who are the victims of sexual abuse is not limited to

22   psychological and emotional injury.  Serious physical injuries

23   often result as well."

24       They cite to some other cases.

25       "When child pornography is produced in conjunction with

1    the sexual abuse of children as it was here, the harm to the

2    victim, the child victims, is magnified and perpetuated stating

3    that" -- and they're citing the Ferber case, again, which

4    states that the materials produced are a permanent record of

5    the children's participation, and the harm to the child is

6    exacerbated by their circulation."

7        They go on to talk about how, when you produce child

8    pornography, and that child pornography is distributed, it can

9    then be used to incite or encourage others to sexually abuse

10    children, and that is born out by the facts of this case.  The

11    defendant was downloading and viewing child pornography on the

12    internet and then used that child pornography to groom Jane Doe

13    1 to convince her that this was normal behavior, that other

14    little girls, all little girls do this with their daddies, as

15    evidenced by the videos and images that he showed her.

16        So he used that evidence of other children's sexual abuse

17    to perpetuate and cause his own daughter to think that this

18    conduct was normal and acceptable.

19        As to the issue of recidivism, the Irey Court said, "This

20    Court has stated that the threat of recidivism by a pedophile

21    who has sexually abused a child is, quote, 'appalling.'"

22        They cite their prior decision in Peugh and note, "As

23    Congress has found, and as we have discussed, child sexual

24    offenders have appalling rates of recidivism, and their crimes

25    are under-reported."

1     The Supreme Court has noted, quote, "Grave concerns over

2     the high rate of recidivism among convicted sex offenders and

3     their dangerousness as a class and has found that, quote, 'the

4     risk of recidivism posed by sex offenders is frightening and

5     high.'"

6         Those quotes are from the Supreme Court decision in *Smith*

7     *v. Doe*.  The citation is 538 U.S. 84.  That case was decided in

8     2003.

9         The Irey Court went on to say, "The Supreme Court has gone

10    even further finding that when convicted sex offenders reenter

11    society, they are much more likely than any other type of

12    offender to be rearrested for a new rape or sexual assault."

13        Even if it can be said that this defendant's risk of re --

14    or sexually abusing another child is low, the Irey Court

15    addresses that I think very aptly, and they state, "A low risk

16    is not the same as no risk.  Adequate protection is a function

17    of two variables, the level of risk that conduct will occur and

18    the level of harm that will be inflicted if that conduct does

19    occur."

20        They cite to *United States v. Boyd*, a Seventh Circuit

21    decision that can be found at 475 F.3d, 875.  In that case, the

22    Seventh Circuit upheld a sentencing determination that the

23    defendant's acts created a substantial risk of bodily injury to

24    another person in part because, quote, "Dangerousness is a

25    function of the magnitude of the harm that will occur if danger

 1   materializes and the probability that it will materialize."

 2        The Irey Court went on to say, "With child sexual abuse of

 3   the kind that we know Irey is capable of and has committed, the

 4   harm is enormous and permanent.  It can literally destroy

 5   lives, accordingly, even with an assumed low risk of recidivism

 6   following release in 15 years and 3 months."

 7        In that case, based on the sentence that had been given by

 8   the district court, the appellate court in Irey said,

 9   "Imprisonment for that length of time does not afford adequate

10   protection from further crimes by him."

11        You know in this case, Your Honor the defendant is asking

12   for 15 years.  He's asking this Court to give him the statutory

13   mandatory minimum sentence that he would face for a single

14   count of producing child pornography.  He would face that

15   sentence if he took one picture of Jane Doe 1, one sexually

16   explicit picture, even if it was just a lascivious exhibition

17   of the genitals as opposed to the videos he created which, as

18   Your Honor has seen firsthand, are much more serious than that.

19        The Government asks the Court to give this defendant a

20   sentence, the only sentence that we think does adequately

21   address the 3553(a) factors, and that is sufficient but not

22   greater than necessary to meet all of the factors in 3553, and

23   that is a life sentence, Your Honor.

24        Thank you.

25             THE COURT:  Thank you very much.

1    Mr. Soliday, I'm going to give you an opportunity to make

2  any response you want to make.

3         MR. SOLIDAY:  Okay.  There's a lot I could respond to

4  there, but I'll be brief and focus on this.

5    What I tried to show the Court as far as first offender,

6  first conviction, whatever, is if you have prior convictions,

7  as you know, that's a classic aggravating factor.  You know,

8  some judges will go through and say, "Well, you were arrested

9  this time and have 15 convictions, and, therefore, it justifies

10 a greater sentence."

11   In this case, for the majority of his life, he's led a

12 law-abiding life.  He didn't show a disrespect for the law and

13 get arrested whether it was DUIs or sex offenses or anything

14 like that.  He doesn't have a prior sex conviction.  He's not a

15 registered sex offender.

16   If the Court were to give him a life sentence on his first

17 conviction, that gives him no possibility to learn from his

18 past conduct and another chance.  Okay.  And so if you were to

19 give him a life sentence where -- so if he had prior

20 convictions, would you give him two life sentences then?

21   I mean, at some point, he's got to be able to have -- or I

22 think he should be able to pay for his crime, come back out, go

23 through whatever type of supervision they're going to have him

24 on, which is probably polygraph testing and everything else to

25 try and contain, to make sure he doesn't commit this crime

 1    again, I think that is a life sentence, or even a 40-year

 2    sentence is greater than necessary to punish this man for what

 3    he's done.

 4        Thank you.

 5            THE COURT:  Thank you.

 6        The Court will now address the parties' arguments.

 7        In accordance with 18, U.S.C. § 3553(a), in determining a

 8    particular sentence to be imposed, the Court must consider the

 9    nature and circumstances of the offense, the history and

10    characteristics of the defendant, and the Court must impose a

11    sentence sufficient but not greater than necessary to comply

12    with the following purposes:  To reflect the seriousness of the

13    offense; to promote respect for the law and to provide just

14    punishment for the offense; to afford adequate deterrence to

15    criminal conduct; to protect the public from further crimes of

16    the defendant, and to provide the defendant with needed

17    correctional treatment in the most effective manner.

18        In addition, the Court must consider the kinds of

19    sentences available, the advisory range, any pertinent policy

20    statements issued by the Sentencing Commission, the need to

21    avoid sentencing disparities, and the need to provide

22    restitution.

23        The Court must consider each of these factors and apply

24    them without any thumb on the scale favoring a guideline

25    sentence.

1    In considering the factors in Section 3553(a), the Court
2    also notes that Mr. Brewster and Mr. Brewster's family and
3    friends submitted letters.  I've read all the letters, and I
4    will take them into account in reaching Mr. Brewster's
5    sentence.  All the letters were filed and made part of the
6    record.
7    In this case, a sentence that is sufficient but not
8    greater than necessary to comply with the purposes of
9    sentencing is a sentence of 420 months of imprisonment, which
10   is 35 years, consisting of 360 months on each of Counts 1
11   through 4, all to be served concurrently.  120 months on Count
12   5, 60 months of which is to be served currently with Counts 1
13   through 4, and 60 months, which is to be served consecutive to
14   Counts 1 through 4, and 120 months on Count 6, which is to be
15   served concurrently with Counts 1 through 4.
16   After Mr. Brewster's incarceration is over, Mr. Brewster
17   will be placed on supervised release for a period of 20 years
18   for each of Counts 1 through 6; all to run currently.
19   The sentence is warranted by the totality of the Section
20   3553(a) factors.  In particular, the Court has considered the
21   nature and circumstances of the offense.  The defendant
22   repeatedly forced a child, at least from the age of six, to
23   perform oral sex on him and perform oral sex on her along with
24   other acts of sexual abuse and degradation and videotaped some
25   of these acts.  He groomed her to do what he wanted by showing

1    her pornographic videos.  The child is heard to say on one of

2    the videos, "I thought every little girl did that" -- referring

3    to performing oral sex -- "when you were little."

4         He conditioned privileges on her performing sex acts.  A

5    child's handwritten note was found in Mr. Brewster's home that

6    read, "If I suck your dick, can I play with Sarah?"

7         I'm at a loss for words strong enough to convey the

8    horrendousness of his conduct toward this child.

9         Mr. Brewster also received and possessed child

10   pornography.  One of the tapes from his home shows a video

11   monitor depicting pornographic images of young children and

12   teens.

13        The Court has also considered the history and

14   characteristic of the defendant.  He is a 41-year-old man with

15   a history of mental illness who is receiving Social Security

16   disability payments.

17        According to the Social Security actuarial life table, his

18   life expectancy is 37 years, which is 440 months.

19        He has used marijuana since he was a teenager.  He reports

20   having been sexually abused by a cousin and a scout master as

21   well as having been a victim of bullying when he was a child.

22   He also has charges pending in Porter County for the underlying

23   conduct for the instant offense, but no other criminal history.

24        Mr. Brewster suggests that his abnormal sexual desire and

25   poor impulse control may be the result of a head injury he

 1    sustained as a teenager, but there is no definitive evidence

 2    that this is the cause of his criminal behavior.

 3         In any case, the Court does not believe that his sentence

 4    should be either increased or decreased on account of his

 5    mental health issues.  The Court has not encountered a

 6    pedophile who does not have mental health issues in addition to

 7    pedophilia.  The fact that he may have poor impulse control

 8    most certainly does not lessen his danger to society.

 9         In his letter to the Court, Mr. Brewster maintains that he

10    took better care of the children entrusted to him that anyone,

11    even parents who do not have his psychological issues, and that

12    he would have died to protect them.  He refers to his conduct

13    as a mistake.  He seems oblivious to the fact that Jane Doe 1

14    most needed protection from him, and that his conduct to hoard

15    her was not a mere mistake but a series of hideous crimes that

16    he committed repeatedly over the course of at least three

17    years.

18         The Court believes that the given sentence reflects the

19    seriousness of the offense, promotes respect for the law, and

20    provides just punishment for the offense.

21         The damage Mr. Brewster has inflicted upon a helpless,

22    young child who should've been able to rely on him for

23    protection is incalculable.  He has stolen her childhood.

24         Taking these sentencing factors into consideration, a

25    sentence of 35 years in prison is appropriate.  In giving this

1   sentence, the Court also believes that the sentence will afford

2   adequate deterrence to criminal conduct; likewise, this

3   sentence is sufficient to protect the public from further

4   crimes of the defendant.  Nothing that Mr. Brewster has argued

5   convinces the Court that a shorter sentence would adequately

6   protect the public from him.  His claim of poor impulse control

7   increases the risk that he could reoffend.

8        Finally, the sentence to be imposed will provide the

9   defendant with needed correctional treatment in the most

10   effective manner.

11        The Court has also considered the kinds of sentences

12   available, the advisory range, the pertinent policy statements

13   issued by the Sentencing Commission, and the need to avoid

14   sentencing disparities in arriving at its decision.

15        Mr. Brewster will be approximately 71 years of age when he

16   is released from prison.

17        Mr. Brewster, would you and Mr. Soliday please approach

18   the podium?

19        Mr. Soliday, now that you've heard my reasoning about the

20   applicability of the Section 3553(a) factors in this case, as

21   Mr. Brewster's lawyer, do you have anything else to say on

22   Mr. Brewster's behalf?

23             MR. SOLIDAY:  No, Your Honor.

24             THE COURT:  Mr. Soliday, are you satisfied the Court

25   has addressed your main arguments in mitigation?

 1          MR. SOLIDAY:  Yes, Your Honor.

 2          THE COURT:  Mr. Brewster, I ask you the same question

 3   I asked Mr. Soliday.  Now that you've heard my reasoning about

 4   the applicability of the Section 3553(a) factors in your case,

 5   is there anything else you would like to say on your own

 6   behalf?

 7          THE DEFENDANT:  No, sir.

 8          THE COURT:  And the same question I asked

 9   Mr. Soliday.  Are you satisfied I addressed your arguments in

10   mitigation?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  And, Ms. Koster, does the Government have

13   any further comments or recommendations?

14          MS. KOSTER:  No, Your Honor.

15          THE COURT:  I will now state the sentence.  After I

16   finish stating the sentence, I will give counsel one final

17   chance to make legal objections before the sentence is imposed.

18       It is the judgment of the Court that the defendant is

19   hereby committed to the custody of the Bureau of Prisons for a

20   term of 35 years, which is 420 months.

21       This consists of a sentence of 30 years, 360 months on

22   each of Counts 1 through 4, all to be served concurrently, as

23   well as a term of 10 years, 120 months, on Count 5.  Five

24   years, or 60 months, of which is to be served concurrently with

25   Counts 1 through 4, and 5 years with 60 months of which is to

1    be served consecutive to Counts 1 through 4, and 120 months on

2    Count 6, which is to be served currently with Counts 1 through

3    4.

4         Defendant shall be placed on 20 years of supervised

5    release for each of Counts 1 through 6, all to run

6    concurrently.

7         While defendant is on supervised release pursuant to this

8    judgment, defendant shall comply with the following mandatory

9    conditions:  Defendant shall not commit another federal, state,

10   or local crime.  Defendant must report to the probation office

11   in the district to which the defendant is released within 72

12   hours of release from the custody of the Bureau of Prisons.

13   Defendant shall not unlawfully possess a controlled substance.

14   Defendant shall refrain from any unlawful use of a controlled

15   substance.  Defendant shall submit to one drug test within 15

16   days of release from imprisonment and two periodic drug tests

17   thereafter as determined by the Court.  Defendant shall not

18   possess a firearm, ammunition, destructive device, or any other

19   dangerous weapon.  Defendant shall cooperate in the collection

20   of DNA as directed by the probation officer.  Defendant shall

21   register with the state sex offender registration agency in the

22   state where the defendant resides, works, or is a student, as

23   directed by the probation officer.  Further, the defendant

24   shall comply with the 15 standard conditions that have been

25   adopted by this Court.

```
 1        Mr. Brewster, I'm not going to read these to you; instead,
 2   you'll be given a copy of them at the conclusion of the
 3   hearing.  They'll be filed of record.
 4        In addition, defendant shall comply with the following
 5   special conditions:  Defendant shall participate in a mental
 6   health and substance abuse treatment program and shall abide by
 7   all program requirements and restrictions.  Defendant shall pay
 8   all or part of the costs of participation in the program not to
 9   exceed the sliding fee scale as adopted by this Court.
10   Defendant shall participate in sex offender testing and
11   evaluation to include psychological, behavioral assessment,
12   and/or polygraph examinations as a means to insure compliance
13   with program requirements and restrictions.  Defendant shall
14   pay all or part of the costs for participation of the program
15   not to exceed the sliding fee scale as adopted by this Court.
16   Defendant shall enter and attend sex offender specific group
17   and individual counseling at an approved outpatient treatment
18   program, if warranted, from the testing and evaluation and
19   assessments, and shall abide by all program requirements and
20   restrictions.  Defendant shall pay all or part of the costs for
21   participation in the program not to exceed the sliding fee
22   scale adopted by this Court.  Defendant shall participate in
23   sex offender polygraph examination as a means to insure
24   compliance with program requirements and restrictions.  And
25   defendant shall pay all or part of the costs for participation
```

 1    in the program not to exceed the sliding fee scale.

 2         Defendant shall not frequent places where children under

 3    the age of 18 congregate, nor associate, or have verbal,

 4    written, telephonic, or electronic communications with any

 5    persons under the age of 18 without the permission of the

 6    probation officer.  This provision does not encompass persons

 7    under the age of 18 with whom the defendant must deal in order

 8    to obtain ordinary and usual commercial services.  Defendant

 9    shall not view or listen to any form of pornography, sexually

10    stimulating material, or sexually oriented material, or

11    patronize locations where such material is available.

12    Defendant may not use the internet services to access sexually-

13    oriented sites or discussion areas.  Probation shall have

14    access to defendant's electronic or internet capable devices as

15    well as phone and internet providers to verify the above is

16    being complied with.

17         Defendant shall submit his person at any property, house,

18    residence, vehicle, papers, computer, other electronic

19    communication, or data storage devices or media and effects to

20    search at any time with or without a warrant by any law

21    enforcement or probation officer with reasonable suspicion

22    concerning a violation of a condition of supervision or

23    unlawful conduct by the defendant.

24         Based on a thorough review of the defendant's financial

25    condition as detailed in the presentence report, the Court

 1    finds that the defendant does not have the ability to pay a

 2    fine.  The Court will waive a fine in this case.

 3         It is further ordered that the defendant shall pay to the

 4    United States a total special assessment of $600, which shall

 5    be due immediately.

 6         Ms. Koster, with regards to restitution, is the Government

 7    going to make a claim for restitution?

 8              MS. KOSTER:  Your Honor, I have not received any

 9    requests along those lines; however, I would ask the Court to

10    keep the 90-day window open pursuant to statute in case I do

11    receive a request.

12              THE COURT:  Okay.  The 90-day window will be kept

13    open.

14              MS. KOSTER:  Thank you, Judge.

15              THE COURT:  Obviously, if we're going to do

16    something, I want to do it well within the 90 days.

17              MS. KOSTER:  I understand.

18              THE COURT:  Further, the defendant shall forfeit to

19    the United States all property, real and personal, used or

20    intended to be used to commit or to promote the commission of

21    the offense charged herein, included but not limited to all

22    computer and computer equipment used in the offense, all

23    cameras and camera equipment used in the offense, and all

24    electronic storage media used in the offense.

25         And, Counsel, do either of you know any reason other than

 1   what you've already argued why the sentence should not be

 2   imposed as stated?

 3            MR. SOLIDAY:  No, Your Honor.

 4            MS. KOSTER:  No, Your Honor.

 5            THE COURT:  Mr. Brewster, other than what you've

 6   already told me, do you know any reason why the sentence should

 7   not be imposed as stated?

 8            THE DEFENDANT:  No, sir.

 9            THE COURT:  The Court orders the sentence imposed as

10   stated.

11      As required by 18, U.S.C. § 3583(f), the Court directs the

12   probation officer to provide the defendant with a written

13   statement that sets forth all conditions to which the term of

14   supervised release is subject and that is sufficiently clear

15   and specific to serve as a guide for the defendant's conduct

16   and for such supervision.

17      And at defendant's request, the Court would recommend that

18   Mr. Brewster be permitted to serve his sentence at the closest

19   facility to the Chicagoland area which offers treatment for

20   both the psychological problems that Mr. Brewster has and also

21   the pedophilia problems that Mr. Brewster has.

22      Also, I would request that Mr. Brewster be given credit

23   for all time served on this charge to date.

24      Mr. Brewster, I want you to understand these are mere

25   recommendations to the Bureau of Prisons.  They make the final

1    decision as to where you serve your sentence; however, my

2    recommendation is one of the factors they do consider.

3        Mr. Brewster, you have heard the judgment of this Court

4    imposing sentence upon you.  Pursuant to Rule 32(j)(1)(B) of

5    the Federal Rules of Criminal Procedure, I now advise you that

6    you can appeal your conviction in this case if you believe that

7    your guilty plea was somehow unlawful or involuntary or there

8    was some other fundamental defect in the proceeding that was

9    not waived by your guilty plea.  You also have a statutory

10   right to appeal your sentence under certain circumstances,

11   particularly if you think the sentence is contrary to law.

12       With few exceptions, any notice of appeal must be filed

13   within 14 days of the entry of judgment in your case.

14       If you want to file an appeal, and if you're unable to pay

15   the cost of an appeal, you may apply for leave to appeal in

16   forma pauperis, which means that you may be able to pursue an

17   appeal at no cost to yourself.

18       If you so request, the Clerk of the Court will prepare and

19   file a notice of appeal on your behalf.

20       And, Mr. Soliday, I remind you of your duty to perfect a

21   timely appeal of this sentence should your client wish to do

22   so.

23       Furthermore, pursuant to Circuit Rule 51, you are

24   responsible for the continued representation of your client on

25   appeal unless specifically relieved by the Court of Appeals

1    upon a motion to withdraw for good cause.

2        All requests for appointment of appellate counsel must be

3    taken to the Court of Appeals.  This Court does not have the

4    power to entertain such request.

5        The Court directs the probation office that the

6    indictment, presentence report, judgment and conviction, and

7    any other information required by 28, U.S.C § 994(w)(1) be sent

8    to the United States Sentencing Commission.

9        And, Counsel, anything else we need to address today?

10   Mr. Soliday?

11            MR. SOLIDAY:  No, Your Honor.

12            THE COURT:  Ms. Koster?

13            MS. KOSTER:  No, Your Honor.

14            THE COURT:  Mr. Brewster, do you have any questions?

15            THE DEFENDANT:  No, sir.

16            THE COURT:  Good luck.

17       Mr. Brewster is remanded to the custody of the United

18   States marshal.  The Court's adjourned.

19            MS. KOSTER:  Does the Court want these exhibits?

20            THE COURT:  Yes, we need them.

21       (Hearing concluded.)

22

23

24

25

1                     CERTIFICATE OF REPORTER

2        I, Richard D. Ehrlich, a Registered Merit Reporter and

3   Certified Realtime Reporter, certify that the foregoing is a

4   true, complete, and accurate transcript of the proceedings

5   ordered to be transcribed in the above-entitled case before the

6   Honorable Joseph Van Bokkelen, in Hammond, Indiana, on January

7   30, 2014.

8   s/Richard D. Ehrlich                    February 21, 2014
                                        _____
9   Richard D. Ehrlich, Official Court Reporter        Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25